UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THE STATE OF LOUISIANA                                    CIVIL ACTION

VERSUS

SANOFI-AVENTIS U.S. LLC, ET AL.                           NO. 23-302-BAJ-SDJ

**<u>MEMORANDUM IN SUPPORT OF LOUISIANA'S MOTION TO REMAND</u>**

## TABLE OF CONTENTS

**TABLE OF CONTENTS**     ii

**TABLE OF AUTHORITIES**     iv

**I.**     **INTRODUCTION**     1

**II.**     **BACKGROUND**     2

**III.**     **ARGUMENT AND AUTHORITIES**     4

     **A. Defendants' Notices of Removal Ignore the Proprietary, Sovereign, and Quasi-Sovereign Nature of the State's Claims and Remedies, as well as State of Louisiana's Eleventh Amendment Sovereign Immunity.**     5

         **1. Claims & Remedies that the State of Louisiana Brings / Seeks Both in its State-Law Enforcement Capacity and as *Parens Patriae* of its People are Independent of any Co-Pays or Out-of-Pocket Costs Borne by Individual Citizens.**     5

         **2. As This Action is brought by a Sovereign State That Has Not Waived Sovereign Immunity, Louisiana 's Action May Not Be Removed to a Federal Forum.**     10

     **B. Defendants' Federal-Officer Removal Fails.**     11

         **1. Law Governing Federal-Officer Removal.**     11

         **2. Neither Express Scripts nor Caremark has Carried Its Burden to Show that Any Supposed Contractual Obligations to a Private Government Contractor Provides An Adequate Basis for Federal-Officer Removal.**     13

         **3. Neither Express Scripts nor Caremark Has Carried Its Burden to Show—Through Evidence – That It "Acted Under" the Direction of a Federal Officer.**     14

         **4. Neither Express Scripts Nor Caremark has Carried Its Burden to Show—Through Evidence—that the Insulin-Price-Fixing Scheme Described in Louisiana's Petition Is In Any Way Related to Any Act Ostensibly Taken Under Color of Federal Office.**     22

5. **Neither Express Scripts nor Caremark Has Carried Its Burden to Establish a "Colorable" Federal Defense.** .......... 26

    *a. Neither of the PBM Defendants Has Carried Its Burden to Present Evidence Establishing a Colorable "Government-Contractor Immunity" Defense.* .......... 27

    *b. Neither of the PBM Defendants Has Carried Its Burden to Present Evidence Establishing a Colorable Preemption Based Defense.* .......... 30

**C.** <u>**Remand is Constitutionally Required Due to Lack of Subject Matter Jurisdiction.**</u> .......... 31

1. **The Federal TRICARE and FEHBA Statutes Provide No Causes of Action and Plaintiff's Well-Pleaded Complaint Raises No Claims Related to the Statutes.** .......... 31

2. **The TRICARE and FEHBA Statutes Provide No Complete Preemption of State Law Claims that Would Justify an Exception to the Well-Pleaded Complaint Rule.** .......... 33

    *a. Any Affirmative Defense Based Upon Express Complete-Preemption Fails.* .......... 34

    *b. Any Affirmative Defense Based Upon Implied Complete-Preemption Also Fails.* .......... 35

**IV.** **CONCLUSION** .......... 40

## **TABLE OF AUTHORITIES**

**United States Constitution**

U.S. Const. Art. III                                                                 4, 5, 26, 30, 31

U.S. Const. amend. XI                                                           9

**Federal Statutes:**

5 U.S.C. §§ 8901 *et seq.*                                                     4, 5, 17, 38

10 U.S.C. §§ 1071, *et seq.*                                                  4, 29, 37

12 U.S.C. §§ 85-86                                                              34

28 U.S.C. § 1331                                                                31, 32

28 U.S.C. § 1332                                                                31

28 U.S.C. § 1367:                                                              4

28 U.S.C. § 1441                                                                31

28 U.S.C. § 1442                                                                *passim*

28 U.S.C. § 1447                                                                33

29 U.S.C. § 185                                                                 34

29 U.S.C. § 1132                                                                34

29 U.S.C. §1144                                                                 36

32 C.F.R. § 199.17                                                             4, 37, 38

**State Statutes:**

La. R.S. §51:1401, *et seq.*, the Louisiana Unfair Trade Practices Act ("LUTPA")        3

La. R.S. §51:121, *et seq.,* Louisiana Monopolies Act ("LMA").        3

La. R.S. §46:437.1, *et seq.*, the Medical Assistance Programs Integrity Law ("MAPIL")   3

**Cases:**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982)        7, 8

iv

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008)                                                   34, 35, 36

*Anderson v. American Airlines, Inc.*, 2 F.3d 590 (5th Cir. 1993)                                   32

*Barbier v. Connolly*, 113 U.S. 27 (1885)                                                           35

*Baris v. Sulpicio Lines, Inc.*,932 F.2d 1540, 1546 (5th Cir. 1991)                                 12, 31

*Bates v. Dow Agrosciences* LLC, 544 U.S. 431 (2005)                                                34

*Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003)                                               33

*Box v. PetroTel, Inc.*, 33 F.4th 195 (5th Cir. 2022)                                               15, 17

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988)                                                 28, 29

*Cal. Div. of Labor Stds. v. Dillingham Const., N.A., Inc.*, 519 U.S. 316 (1997)                    32

*Carlson v. Arrowhead Concrete Works, Inc.*, 445 F.3d 1046 (8th Cir. 2006)                          33

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)                                                 32

*Chevron USA, Inc. v. Plaquemines Par.*, 143 S. Ct. 991 (2023)                                      12

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992)                                             35

*City of New Haven v. Purdue Pharma, L.P.*, No. X07 HHD CV 17 6086134 S, 2019 Conn. Super. LEXIS 55 (Super. Ct. Jan. 8, 2019)    8

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821)                                    10

*Cnty. Bd. of Arlington v. Express Scripts Phrm.*, 996 F.3d 243 (4th Cir. 2021)         18, 19, 28

*First Nat'l Bank of Aberdeen v Aberdeen Nat'l Bank*, 627 F.2d 843 (8th Cir. 1980)                  33

*Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404 (5th Cir. 2010)                          34

*Friberg v. Kan. City S. Ry.*, 267 F.3d 439 (5th Cir. 2001)                                         35

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)                                              7

*Gilberg v. Stepan Co.*, 24 F. Supp. 2d 325 (D.N.J. 1998)                                           30

*Glenn v. Tyson Foods, Inc.*, 40 F.4th 230 (5th Cir. 2022)                                          15

*Hillsborough County, Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707 (1985)                       35

*Huber, Hunt & Nichols, Inc. v. Architectural Stone Co.*, 625 F.2d 22, (5th Cir. 1980)              11

*In re Flonase Antitrust Litigation*, 879 F.3d 61, 65 (3rd Cir. 2017)                               10, 11

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626 (2d Cir. 1990)   23, 30

*In re Katrina Canal Litig. Breaches*, 524 F.3d 700 (5th Cir. 2008)   11, 23, 28, 30

*Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315 (S.D. Miss. 2003)   12, 16

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020)   22, 27

*Louisiana v. Texas*, 176 U.S. 1 (1900)   7

*Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002)   11

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926)   26

*Mayor of Balt. v. BP P.L.C.*, 952 F.3d 452 (4th Cir. 2020)   28

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)   34, 36

*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986)   13

*Mesa v. California*, 489 U.S. 121, 136 (1989)   4, 5, 12, 25, 26, 31

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, (1985)   35

*Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580 (5th Cir. 2022)   14, 40

*Moore ex rel. Miss. v. Abbott Labs., Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995)   11

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)   32, 34, 37

*Pennhurst State Sch. & Hosp.*, 465 U.S. 89 (1984)   10

*Pennsylvania v. New Jersey*, 426 U.S. 660, 665-66 (1976)   9

*Plaquemines Par. v. Chevron USA, Inc.*, No. 22-30055, 2022 WL 9914869
(5th Cir. Oct. 17, 2022)   12, 14, 15, 18, 19

*Port of Corpus Christi Auth. of Nueces Cnty., Tex. v. Port of Corpus Christi L.P.*,
57 F.4th 432 (5th Cir. 2023)   13, 16, 17

*Retail Clerks v. Schermerhorn*, 375 U.S. 96 (1963))   34

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)   35

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012)   21, 22

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S.Ct. 474 (2020)   31, 34 - 38

*St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co. (St. Charles I)*, 935 F.3d 352 (5th Cir. 2019)                                                          20, 21

*St. Charles Surgical Hosp., LLC v. La. Health Serv. & Indem. Co. (St. Charles II)*, 990 F.3d 447 (5th Cir. 2021)                                                          20, 21

*Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100 (5th Cir. 1981)                    31

*State v. Texas Co.*, 199 La. 846, 850 (1942)                                       7

*Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267 (2d Cir. 2005)                       32

*Tennessee v. Davis,* 100 U.S. 257, 263, 25 L. Ed. 648 (1879)                       12

*Texas v. American Tobacco Co.*, 14 F. Supp.2d 956 (E.D. Tex. 1997)                 8

*United States v. Hazlewood*, 526 F.3d 862 (5th Cir. 2008)                          31

*Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983)                   13, 27

*Washington v. Monsanto Co.*, 738 F. App'x 554 (9th Cir. 2018)                      28

*Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007)                     12, 14, 15, 20, 27

*Willingham v. Morgan*, 395 U.S. 402, 406-407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)   12

*Winn v. Cal. Post Acute LLC*, 532 F. Supp. 3d 892, (C.D. Cal. 2021)                20

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998)          27

**Secondary Sources**

David S. Rubenstein, *Supremacy, Inc.*, 67 UCLA L. REV. 1130 (2020)                 8

Jim Ryan et al., *Suing on Behalf of the State:  A Parens Patriae Primer*, 86 Ill. B.J. 684 (Dec. 1998)                                                            7

Kate Sablosky Elengold and Jonathan D. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969 (2021)                                                           11, 18

 Richard Ieyoub, et al., *State Attorney General Actions, The Tobacco Litigation, and The Doctrine of Parens Patriae*, 74 Tul. L. Rev. 1859 (June 2000)              7

Plaintiff the State of Louisiana moves to remand because the Court lacks subject-matter jurisdiction over this state-consumer-protection action that raises exclusively state-law claims challenging an insulin-price-fixing scheme occurring entirely outside the scope of any supposed relationship—contractual or otherwise—between any supposed "federal officer" and any PBM Defendant.[1] The only claimed basis for removal here is federal-officer jurisdiction. But the PBM Defendants failed to carry their burden to show—*with evidence*—that each of the four requirements for federal-officer removal is met. And sovereign immunity bars removal in any event. The Court should grant the motion and send this case back to state court where it belongs.

## I.     <u>INTRODUCTION</u>

In its Amended Petition, the State of Louisiana raises not a single federal claim.  Not only did Defendants' wrongful and deceptive conduct both precede and continue entirely outside the scope of any ostensible contractual obligations existing between Defendants and the federal government, but no remedies sought by the State, even if fully granted, would impact any such contractual obligations in any way. Significantly, neither PBM Defendant asserts that it has a direct contractual relationship with the federal government.  Rather, each Defendant claims that it has a more attenuated government relationship; namely, through each Defendant's respective role as either a subcontractor or corporate "affiliate" of a private entity that contracts with an agency of the federal government to provide health-plan related services to employees of that agency. Neither PBM Defendant asserts that it has a direct contractual relationship with the federal government. Rather, each Defendant claims that is has a more attenuated government relationship; namely, through each Defendant's respective role as either a subcontractor or corporate "affiliate" of a

---

[1] This brief refers to Defendants Express Scripts Administrators, LLC d/b/a Express Scripts ("Express Scripts") and CaremarkPCS Health, LLC, ("Caremark") collectively as the "PBM Defendants."

private entity that contracts with an agency of the federal government to provide health-plan related services to employees of that agency.

In removing the State's action to this Court, Defendants seek to eviscerate longstanding legal precedent establishing the State's sovereign power to enforce its own laws, its quasi-sovereign, *parens patriae* power to protect the health and welfare of its citizens, and the overarching judicial deference traditionally accorded the Plaintiff's choice of forum—especially where that Plaintiff is the State itself seeking to litigate in its own courts. Defendants advance an insupportably broad interpretation of the federal-officer removal statute; namely, an interpretation that would allow virtually *any* private entity that contracts to provide *any* product or service to the federal government (or subcontracts with a government contractor to do so) to nullify the well-pleaded complaint rule, and one that would allow virtually any federal regulation to preempt state law. Drawn to their logical conclusion, Defendants' arguments would, by upending these well-established legal principles, raise serious constitutional concerns regarding the separation of powers, federal supremacy, and states' rights. As the 19th Judicial District Court for East Baton Rouge Parish is the proper venue for a vast majority of suits filed by the State, adopting the Defendants' arguments would also lead to a significant number of suits that should be in state court ending up on this Court's docket. For these reasons, set forth more fully below, Defendants' efforts to remove this action to a federal forum should be rejected.

## II.    **BACKGROUND**

The State of Louisiana filed its original Petition on March 14, 2023, and its Amended Petition shortly thereafter, in the 19th Judicial District Court for East Baton Rouge Parish, Louisiana, Civil Action No. C-72979121. *See* ECF Doc. 1-2 (Am. Pet., filed March 27, 2023); ECF. Doc 1-4 (Orig. Pet.). The parties agree that the Amended Petition is the operative pleading

in this action.  *See* ECF Doc. 1 at ¶16.  In its petition, the State asserts claims, *inter alia*, for damages and injunctive relief based upon the Defendants' participation in an extensive pricing scheme between certain Pharmacy Benefit Managers ("PBMs"), including Express Scripts and Caremark, and certain manufacturers of insulin and other at-issue diabetes medications and products.[2]  At its core, the State's petition asserts that Defendants conspired together to create, in the words of Congress, "a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof," thereby extracting illegal profits from the State and its citizens.  *See* Am. Pet., ECF Doc. 1-2, at ¶¶ 6, 137-138.  The medications have become so unaffordable that many diabetics and other patients have been forced to go without.  As hundreds of thousands of Louisiana residents rely upon these diabetes medications to stay alive, both the public health and safety and economic impacts of the Insulin Pricing Scheme upon the State and its citizens have been staggering. *See* ECF Doc. 1-2, at ¶¶ 1-4, 7-8.

The State of Louisiana brings its enforcement action through its Attorney General, both in its sovereign capacity, as well as in its proprietary and *parens patriae* capacities.  ECF Doc. 1-2 at ¶¶ 9-15, 163-178.  To that end, Plaintiff seeks penalties, damages, restitution, injunctive relief, costs, and fees on behalf of itself and its citizens, including civil penalties and fines under the Louisiana Unfair Trade Practices Act ("LUTPA"), the Medical Assistance Programs Integrity Law ("MAPIL"), and the Louisiana Monopolies Act ("LMA"). *Id.* at ¶¶ 9-15, 141, 176, 181, 185, 187, 188, 202.  Even though all of Plaintiff's causes of action arise solely under state law, Defendants nevertheless filed Notices of Removal in this Court on April 19, 2023. *See* ECF Doc. 1-2 at ¶¶ 179–216; ECF Doc. 1; ECF Doc. 4.  Defendants purport to remove the State's entire state-law

---

[2] "Manufacturer Defendants" are Sanofi-Aventis U.S. LLC and Novo Nordisk, Inc.

action to this Court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), and the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(a).[3]

### III.   ARGUMENT AND AUTHORITIES

In attempting to upend the State's choice of forum through federal-officer removal, Defendants recycle the same specious arguments throughout their notices.  To that end, Express Scripts relies upon the "TRICARE statute," a federal statute that authorizes "[t]he [Department of Defense ("DoD")] . . . to enter into contracts for the provision of healthcare services to TRICARE members," that requires "the Secretary of Defense to establish an 'effective, efficient, integrated pharmacy benefits program' for TRICARE," and that claims broadly—by apparent Congressional fiat—to preempt any State law "relating to health insurance, . . . health plans, . . . health care delivery or financing . . . ."[4]  Caremark cites a different—though no more compelling—federal statute in support of its analogous argument:  the Federal Employees Health Benefits Act ("FEHBA"), a federal statute that authorizes the United States Office of Personnel Management ("OPM") "to contract with private carriers for federal employees' health insurance" and apparently purports, also by Congressional fiat, to "supersede and preempt any State or local *law*, or any regulation issued thereunder, which relates to health insurance or plans."[5]

None of Defendants' arguments withstand careful judicial scrutiny.  "Section 1442(a) . . . is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant":  The statute "cannot independently support Art. III 'arising under' jurisdiction." *Mesa v. California*, 489 U.S. 121, 136 (1989).  In clear violation

---

[3] Each Defendant asserts that its status as a subcontractor for or corporate affiliate of a private government contractor provides adequate basis for federal-officer removal.  *See, e.g.,* ECF Doc. 1 at ¶ 1 and ¶ 51.

[4] *See* ECF Doc. 1 at ¶¶ 28, 49-50 (citing 10 U.S.C. §§ 1071, 1072(7), 1073(a), 1073a, 1074g, 1103(a), and 32 C.F.R. § 199.17(a)(7).

[5] *See* ECF Doc. 4 at ¶¶ 1, 6-7, 32-37 (citing 5 U.S.C. §§ 8902(a) and (m)(1)).

of this Constitutional limitation, both Defendants nevertheless claim that the *very same* contractual and statutory language satisfies multiple prongs of the four-pronged test for federal-officer removal (i.e., that such language both demonstrates that Defendants were "acting under" federal direction, and *also* serves to support their "independent" federal defenses—or in the case of Express Scripts, *two distinct* "independent" federal defenses).[6]  "The [Defendants'] view, which would eliminate the federal defense requirement, raises serious doubt whether, in enacting § 1442(a), Congress would not have 'expand[ed] the jurisdiction of the federal courts beyond the bounds established by the Constitution.'" *Mesa*, 489 U.S. at 136 (citation omitted).  "Adopting the [Defendants'] view would," moreover, "eliminate the substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems." *Id.* at 137.  For these reasons, and those set forth more fully below, Defendants' federal-officer removal and associated federal-preemption arguments fail as a matter of law.[7]

### A. Defendants' Notices of Removal Ignore the Proprietary, Sovereign, and Quasi-Sovereign Nature of the State's Claims and Remedies, as well as State of Louisiana's Eleventh Amendment Sovereign Immunity.

#### 1. Claims & Remedies that the State of Louisiana Brings / Seeks Both in its State-Law Enforcement Capacity and as *Parens Patriae* of its People are Independent of any Co-Pays or Out-of-Pocket Costs Borne by Individual Citizens.

---

[6] *See* Express Scripts' Removal Notice, ECF Doc. 1 at ¶¶ 27-36, 42-50 (relying upon the very same theories of subcontractor service obligations under the TRICARE contract, 10 U.S.C. §§ 1071 *et seq.*, ostensibly to satisfy the independent "colorable federal defense" prong of 28 U.S.C. § 1442(a)(1) (under two separate theories—government contractor and preemption) as it already had relied upon earlier in its brief to satisfy the "acting under" prong of the statute); *see also* Caremark's Removal Notice, ECF Doc. 4 at ¶¶ 6-10, 26-28, 32-37 (relying upon the same theories of subcontractor service obligations under the FEHBA-authorized (Federal Employees Health Benefits Act) OPM (federal Office of Personnel Management) standard contract with private insurance carriers, *see* 5 U.S.C. §§ 8901 *et seq.*, ostensibly to satisfy the independent "colorable federal defense" prong of 28 U.S.C. § 1442(a)(1) (under a federal preemption theory) as it already had relied upon earlier in its brief to satisfy the "acting under" prong of the statute).

[7] The irony of Defendants' argument that the State's efforts to enjoin the Insulin Pricing Scheme of PBM Defendants and Manufacturers—were those efforts to succeed—would be "inconsistent" with implementation or administration of PBM Defendants' respective contracts (or subcontracts) is not lost on the State of Louisiana and should not be lost on this Court. *See* ECF Doc. 1 at ¶ 49.  What Defendants' argument tends to suggest, of course, is not that the State's cause of action is preempted, but rather that the federal government might *also* have a cause of action against Defendants based upon the same scheme.

5

As clearly stated in its petition, the sovereign State of Louisiana, through its Constitution, has a government established to protect not only the rights of the individual, but also, in its capacity as *parens patriae*, to safeguard the good of the whole, through the promotion and protection of the health, safety, education and welfare of its people.  ECF Doc. 1-2 at ¶¶ 9-10 (citing La. Const. 1974, Preamble and Article I, Section I); 179–216.  This *parens patriae* duty extends to the collective populace of Louisiana, including any citizens who, in their capacity as members / veterans of the armed forces (or family members thereof) or as other federal employees, might conceivably receive some sort of health care coverage through the U.S. Department of Defense or another federal agency (e.g., pursuant to the DoD's TRICARE contract or an OPM/ FEHBA contract).

In other words, while the Attorney General's action on behalf of the State is indeed brought "with respect to purchases of and reimbursements for Defendant's insulin medications and other costs associated with Defendants' behavior," the State brings its action against the Defendants in this case, not in the shoes of its individual citizens nor as a nominal representative of a class-action brought by such citizens, but rather in its own sovereign, quasi-sovereign, and proprietary capacities.  *See* ECF Doc. 1-2 at ¶ 9. Furthermore, Defendants failed to actually identify a specific group of Louisiana citizens that actually receives diabetes medications and/or reimbursement for the costs of such medications through TRICARE or FEHBA. Hence their argument fails as an evidentiary matter as well. Yet even if Defendants had made such a showing, the State's action does not implicate, rely upon, or impugn the administration of those contracts, which exist wholly outside the scope of the challenged conduct.

While the State will produce evidence of the widespread impact that the rapid, exponential increase in the prices of diabetes medications has had on the health and welfare of its citizenry, as

well as on the State itself, it is not seeking damages for the aggregated sum of dollars spent by individual citizens or claimants. Instead, this litigation seeks to enjoin and redress three completely distinct and separate types of past and ongoing harm:  (1) violations of the State's own laws (which the State is uniquely interested and authorized to enforce in its sovereign capacity); (2) threats to the health, welfare and safety of the State's people (a type of quasi-sovereign harm which the State is legally authorized to redress through its *parens patriae* authority);[8]  and, (3) direct financial harm to the State itself (damages that the State is legally authorized to seek in its proprietary capacity).

Indeed, the Supreme Court has explicitly recognized the State's *parens patriae* authority to protect its quasi-sovereign interest in the health, safety, and welfare (both physical and economic) of its population.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982).[9] In *Snapp*, the Supreme Court found that the lower court had focused too narrowly on those directly involved and had ignored the indirect impact on the state and its economy.  *See Snapp*, 458 U.S. 592, 600-01, 607 (1982).  The *Snapp* Court reaffirmed that quasi-sovereign claims are, in fact, separate and distinct from the state's sovereign and proprietary claims, and typically arise when the state can articulate an interest in protecting the health and well-being (physical and/or

---

[8] Threats to the State's environment and natural resources are another example of quasi-sovereign harm which the State is authorized to redress and enjoin through its *parens patriae* authority.  *See Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (Holmes, J.) (observing that "[t]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain," and has "the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air"); *see also State v. Texas Co*., 199 La. 846, 850 (1942) (Louisiana Supreme Court upholds attorney general's authority to vindicate the general interests of the state by bringing an action to cancel a mineral lease). *See generally Louisiana v. Texas*, 176 U.S. 1 (1900) (first case recognizing that a *parens patriae* action could rest upon the articulation of a "quasi-sovereign" interest).

[9] *Snapp* upheld, on State quasi-sovereign interest grounds, the appellate court's reversal of a district court's dismissal of the state's suit to redress poor working conditions of migrant farmworkers, an erroneous dismissal based upon the finding that the state had no standing to bring a claim because those conditions affected only a "small portion" of the state's populace.  *See Snapp*, 458 U.S. 592 (1982); s*ee also, generally* Jim Ryan et al., *Suing on Behalf of the State: A Parens Patriae Primer*, 86 Ill. B.J. 684 (Dec. 1998); Richard Ieyoub, et al., *State Attorney General Actions, The Tobacco Litigation, and The Doctrine of Parens Patriae*, 74 Tul. L. Rev. 1859 (June 2000).

7

economic) of its general populace that exists apart from the interests of particular private parties; i.e., the physical or economic harm affects more than one discrete, identifiable group of individuals. *Snapp*, 458 U.S. at 600-01; *Texas v. American Tobacco Co*., 14 F. Supp.2d 956, 962 (E.D. Tex. 1997) (relying on *Snapp* to conclude that state could maintain a common-law *parens patriae* action without any statutory authority). In other words, even where the challenged conduct has effects on other citizens who may themselves be able to articulate a claim, if the State's quasi-sovereign interests are implicated by that conduct, it is authorized in its *parens patriae* capacity to sue to defend those interests.[10]  The fact that the challenged conduct may have an additional impact upon a discrete group of individuals is a distinct issue not addressed by the State's action and is therefore immaterial. *See Snapp*, 458 U.S. at 600-01, 607.

Defendants' removal is doomed by this critical distinction regarding the quasi-sovereign legal capacity in which the State is bringing its claims: The *parens patriae* nature of the action renders wholly irrelevant all of Defendants' (notably Express Scripts') repeated assertions that the drug-formulary or benefit-plan "copayments" charged to a discrete subset of Louisiana residents are "mandated" or "dictated" by the federal government.  *See, e.g.,* ECF Doc. 1 at ¶¶ 5, 7, 11, 12, 33, 34, 41, 45, 47, 48 (making at least 18 such references throughout the Notice of Removal).[11]

---

[10] By the same token, the distinction between claims arising from a State's sovereign **enforcement actions** versus proprietary interests is also discussed at length in *City of New Haven v. Purdue Pharma, L.P.*, No. X07 HHD CV 17 6086134 S, 2019 Conn. Super. LEXIS 55 (Super. Ct. Jan. 8, 2019), an opioid case. In dismissing the city's lawsuit, the court distinguished the suit from the enforcement actions brought by states. While the city's proprietary claim "[sought]—not to vindicate the public interest as a whole—but to gain money solely for [itself]," the court reasoned, the state-brought claims were "superior to the cities' claims because individual damages aren't at issue in those cases," obviating the need for "the same causation analysis as [that required in] ordinary individual lawsuits for compensatory damages." Id. at *2, *13-14.  The court went on to cite state enforcement claims based upon unfair trade practices as "a good example."  *Id.* at *14.

[11] The unique nature of the State's sovereign and quasi-sovereign claims and remedies also negates Defendants' (specifically, Express Scripts') assertion that federal-government contracts (specifically, the TRICARE contract), and Defendants' purported legal obligations thereunder, create a "conflict" between "federal law" and Louisiana law. *See* ECF Doc. 1 at ¶¶ 48, 50 (referring to such an ostensible conflict of law); *see also* David S. Rubenstein, *Supremacy, Inc.*, 67 UCLA L. REV. 1130, 1167, 1188-90, 1199-202 (2020) (describing how allowing "preemption by contract" and privatized immunity defenses to supply "the displacing conflict" in the absence of a federal statute that actually

Moreover, as the issue of whether certain citizens may or may not have been required to make "copayments" under a federal healthcare plan is irrelevant in this *parens patriae* action, any "federal-officer direction" with regard to such copayments or charges is similarly irrelevant. Accordingly, Defendants' persistent reference to "federally mandated copayments" is a red herring. Louisiana is not stepping into the shoes of Louisiana citizens who receive prescription-drug benefits under the federal-employee-health-benefit contracts, or into the shoes of *any* of its citizens for that matter, in bringing this action as a sovereign State. None of Louisiana's statutory enforcement actions, damages claims, or requests for injunctive relief, *even if fully granted*, would have *any* impact upon either PBM Defendant's contractual obligations to a government contractor (or upon their ostensible sub-contractual obligations to a federal government agency).[12]  The federal-officer removal statute simply does not apply here.

In their respective removal notices, neither PBM Defendant cites a single case involving a sovereign state party. The reason for this is clear:  Sovereign immunity law strikes a fatal blow to Defendants' removal attempt.   Under the Constitution, Louisiana's sovereign status renders it immune from suit in federal court by a state citizen. *See* U.S. Const. amend. XI. In its capacity as a sovereign State, Louisiana is not only clearly entitled to have its action heard in a state forum but is also uniquely authorized to bring and seek sovereign and quasi-sovereign claims and remedies wholly unrelated to Defendants' affirmative defenses regarding their purported federal

---

conflicts with and preempts state law undermines federalism and constitutional principles). *See also*, *infra* **section III. C.**, regarding the constitutional insupportability of Defendants' "preemption by contract" argument.

[12] Indeed, the State of Louisiana would not have the standing to "prosecute" any "debts" owed by ESI to particular citizens of Louisiana under the TRICARE contract. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 665-66 (1976) (citations omitted) (rejecting New Hampshire and New York's effort to invoke the Court's original jurisdiction on grounds that allowing a State to step into the shoes of its citizens to bring a claim against another State would cause "the critical distinction, articulated in Art. III, 2, of the Constitution, between suits brought by 'Citizens' and those brought by 'States' [to] evaporate," and explaining that "a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens").

contractual obligations.   Thus, on state sovereignty grounds alone, the Court should grant Plaintiff's motion to remand.

>    **2.   As This Action is brought by a Sovereign State That Has Not Waived Sovereign Immunity, Louisiana 's Action May Not Be Removed to a Federal Forum.**

In this action, Louisiana brings several claims and enforcement actions in its sovereign capacity to enforce the statutes and laws of the State of Louisiana.  Louisiana chose to bring these claims in state court, as it was legally entitled to do.  An individual citizen (or entity) may not force a State to litigate in a federal forum.  "The Eleventh Amendment provides that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . .'" *See In re Flonase Antitrust Litigation*, 879 F.3d 61, 65 (3rd Cir. 2017) (quoting U.S. Const. amend. XI.).   "The Supreme Court has defined a 'suit' [by an individual against a State] as 'the prosecution, or pursuit, of some claim, demand, or request . . . for the purpose of establishing some claim against it by the judgment of a Court; and the prosecution of that suit is its continuance.'"  *Id.* at 65-66 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 407–08, 5 L.Ed. 257 (1821).   "[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act."  *Id.* at 66 (citing *Pennhurst State Sch. & Hosp.*, 465 U.S. 89, 102 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) (internal quotation marks and citation omitted). In light of the broad *Cohens-Pennhurst* definition of "suit" under the Eleventh Amendment, even a State's involuntary inclusion in a settlement agreement has been barred under that definition. *See In re Flonase*, 879 F.3d 61 (affirming district court's refusal to grant a pharmaceutical company's motion to enforce a settlement agreement against the State of Louisiana).  By the same

logic, Defendants' removal notices easily fit the Supreme Court's broad definition of "suit" as well.[13] As such, Defendants' removal of this action is barred by the Eleventh Amendment.[14]

**B.  Defendants' Federal-Officer Removal Fails.**

As to the required elements for federal-officer removal, Defendants have failed to carry their burden to present evidence establishing that each of the four requirements for federal-officer removal is met.

**1.  Law Governing Federal-Officer Removal**

The statute governing federal-officer removal provides:

> § 1442. Federal officers or agencies sued or prosecuted
>
> > (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
> > (1)  The United States or any agency thereof or any officer (or **any person acting under that officer) of the United States or of any agency thereof**, in an official or individual capacity, **for or relating to any act under color of such office** or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*See* 28 U.S.C. § 1442(a)(1) (emphasis added).

As the removing parties, the PBM Defendants "bear[] the burden of showing that federal jurisdiction exists and that removal was proper." *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). And to meet that burden, the PBM Defendants must come forward with *evidence* establishing *each* of the four elements of federal-officer removal

---

[13] But *cf. Huber, Hunt & Nichols, Inc. v. Architectural Stone Co.*, 625 F.2d 22, 24 n.6 (5th Cir. 1980), for the general proposition that the Eleventh Amendment doesn't apply when the state is a plaintiff. Nevertheless, there is not a bright line rule, as the State of Louisiana was the plaintiff in *In re Flonase, supra*, 879 F.3d 61 (2017). Still further, *In re Katrina Canal Litig. Breaches*, 524 F.3d 700, 711 (5th Cir. 2008), makes clear that *Huber*'s footnote does not "speak directly to the issue" of whether a state-initiated state-court suit may be removed to federal court consistent with sovereign immunity. *See also, Moore ex rel. Miss. v. Abbott Labs., Inc.*, 900 F. Supp. 26, 30–31 (S.D. Miss. 1995) (holding that sovereign immunity bars removal of state-initiated state-court suit).

[14] *See generally* Kate Sablosky Elengold and Jonathan D. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969 (2021).

jurisdiction; mere allegations are insufficient to support removal jurisdiction. *Cf. Plaquemines Par. v. Chevron USA, Inc.*, No. 22-30055, 2022 WL 9914869, at *2 (5th Cir. Oct. 17, 2022) (finding no federal-officer jurisdiction because the proponent of jurisdiction presented "insufficient evidence" to support a finding that it was "act[ing] under a federal officer's or agency's directions"), *cert. denied sub nom. Chevron USA, Inc. v. Plaquemines Par.*, 143 S. Ct. 991 (2023).

While the language of section 1442(a)(1) is ordinarily liberally construed, and while the words "acting under" seem broad, even "broad language is not limitless."  *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147, 127 S. Ct. 2301, 2305 (2007).  Thus, even "liberal construction . . . can find limits in a text's language, context, history, and purposes."[15]  *Id.*  at 147-150. Ultimately, "[t]he purpose of § 1442(a)(1) is to prevent federal officers or those acting at their direction from being held accountable in state courts for acts done within the scope of their federal duties." *See Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315, 1326 (S.D. Miss. 2003) (citing *Tennessee v. Davis,* 100 U.S. 257, 263, 25 L. Ed. 648 (1879)).

Because "Section 1442(a) . . . is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant . . . Section 1442(a) . . . cannot independently support Art. III 'arising under' jurisdiction."  *Mesa*, 489 U.S. at 136.[16]  **"The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged."**  *Id.* at

---

[15] The removal statute originated around the end of the War of 1812 to protect "federal customs officials charged with enforcing a[n] [unpopular] trade embargo with England" "'from interference by hostile state courts'" and was also invoked to protect federal officers in their efforts to seize illegal liquor distilleries.  *Watson*, 551 U.S. at 147-50 (quoting *Willingham v. Morgan*, 395 U.S. 402, 406-407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)).  Indeed, historical review of the statute's purpose and application readily reveals how far afield Defendants' attempted invocation is from the original purpose and context for which it was originally designed and implemented.

[16] Removal jurisdiction is, of course, limited to the scope of original jurisdiction; the provisions of the federal officer removal statute do nothing to change that. *See* 28 U.S.C. § 1441(a); *Baris v. Sulpicio Lines, Inc.*,932 F.2d 1540, 1546 (5th Cir. 1991) (noting that "original subject matter jurisdiction is not waivable").

136-37 (citing *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 494 (1983) (emphasis

added)); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (noting that

under the "well-pleaded complaint" rule "[a] defense that raises a federal question is inadequate

to confer federal jurisdiction")).

Ultimately, "to remove under Section 1442(a), the defendant must show (1) it has asserted

a colorable federal defense, (2) it is a 'person' within the meaning of the statute, (3) that has acted

pursuant to a federal officer's directions, and (4) the charged conduct is connected or associated

with an act pursuant to a federal officer's directions." *Port of Corpus Christi Auth. of Nueces Cnty.,*

*Tex. v. Port of Corpus Christi L.P.*, 57 F.4th 432, 436 (5th Cir. 2023) (quotation omitted).

> **2. Neither Express Scripts nor Caremark has Carried Its Burden to Show that Any Supposed Contractual Obligations to a Private Government Contractor Provides An Adequate Basis for Federal-Officer Removal.**

While corporate entities may qualify as "persons" under 28 U.S.C. § 1442(a)(1), neither

Defendant has presented evidence establishing that they were in fact *the* entity contracting with

the federal government (much less "acting under" the direction of a federal officer).  In advancing

its argument in favor of federal-officer removal under 28 U.S.C. §1442(a)(1), Defendants each

essentially attempt to recharacterize all of Louisiana's claims as somehow arising out of or

**relating back to a single health services contract between a federal agency and a private**

**entity that is not a defendant to this action**.  To that end, Express Scripts characterizes

Louisiana's claims as relating back to a contract that the U.S. Department of Defense ("DoD") has

with an Express Scripts' corporate "affiliate," ESI ("Express Scripts, Inc.") for the provision of

"services to members of the DoD's TRICARE health care program across the country (the

"TRICARE contract"). . . ."[17]  *See* ECF Doc. 1 at ¶ 1.  Caremark characterizes the State's claims

---

[17] Specifically, Express Scripts relies upon a federal statute that "provides . . . authorization for the Secretary of Defense to enter into group health-insurance contracts."  *See* ECF Doc. 1 at ¶ 49 (raising "the defense of preemption

as relating back to a standard contract between OPM and some of Caremark's private health-insurance-carrier clients (a FEHBA-authorized "OPM contract").   As demonstrated more fully below, neither the federal-health-services-administration related statutes nor contracts upon which Defendants rely provide any cognizable basis for federal-officer removal.   Moreover, the nature of Defendants' supposed subcontractor role renders each of their respective relationships to a federal agency far too attenuated to provide adequate basis for treating them as "federal officers" for purposes of the statute. *Cf. Plaquemines Par.*, 2022 WL 9914869, at *4 (explaining that "mere status as subcontractors would not help establish" federal-officer jurisdiction). Express Scripts, for example, relies upon its relationship to an "affiliate" corporation, ESI, though it has not asserted, much less presented evidence to substantiate such an assertion, that it should be treated as ESI's corporate alter-ego, pursuant to a corporate veil-piercing justification or otherwise. Thus, while Express Scripts vaguely advances the presumption that it (rather than ESI, the entity named in the contract) should be treated as the contracting party under the DoD's TRICARE contract, it fails to support that contention with evidence—as it must do.[18] And in any event, "[s]uch a broad expansion of federal jurisdiction is supported by 'neither the language, nor the history, nor the purpose of the statute.'" *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 589–91 (5th Cir. 2022) (quoting *Watson,* 551 U.S. at 152) (brackets omitted).

### 3. Neither Express Scripts nor Caremark Has Carried Its Burden to Show—Through Evidence – That It "Acted Under" the Direction of a Federal Officer.

Neither PBM Defendant carried its burden to present evidence establishing that it was "acting under" the direction of a federal officer. *Accord, e.g., Mitchell*, 28 F.4th at 589–91

---

based on the federal TRICARE statute," 10 U.S.C. §§ 1071, *et seq*. and accompanying regulations codified at 32 C.F.R. § 199.17(a)(7)).

[18] By contrast, Plaintiff provided many detailed facts to support its allegations that Defendant CVS Health directs Caremark's forum-related activities germane to this action.  *See, e.g.,* ECF Doc 1-3 at ¶¶ 20-21.  Express Scripts has provided no similarly detailed facts with regard to Express Scripts' relationship with ESI.

(rejecting federal-officer removal because the removing defendant failed to present "record evidence" establishing that it "acted under" the direction of a federal officer). The statutory phrase "acting under" describes "the triggering relationship between a private entity and a federal officer." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 149 (2007). Although the words "acting under" are "broad," the Supreme Court has emphasized that they are not "limitless." *Id.* at 147. "The Supreme Court defined those limits in *Watson*, which teaches that the relationship contemplated under § 1442(a)(1) 'typically involves subjection, guidance, or control' and 'must involve an effort [by the private party] to assist, or to help carry out, the duties or tasks of the federal superior.'" *Box v. PetroTel, Inc.*, 33 F.4th 195, 199 (5th Cir. 2022) (quoting *Watson*, 551 U.S. at 151–52) (emphasis deleted); *see also Mayor of Balt. v. BP P.L.C.*, 952 F.3d 452, 462 (4th Cir. 2020). "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 153.

Of course "merely being subject to federal regulations is not enough to bring a private action within § 1442(a)(1)." *Plaquemines Par.*, 2022 WL 9914869, at *3. And being "subject to pervasive regulation alone is not sufficient to confer federal jurisdiction," even when there is "cooperation" between "[the private actor] and the federal government." *Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 235 (5th Cir. 2022). "For an entity to be acting under a federal officer or agency, the action must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Plaquemines Par.*, 2022 WL 9914869, at *3 (quotation omitted). "And 'the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* (quoting *Watson*, 551 U.S. at 152) (emphasis original).

15

Here, both Express Scripts and Caremark failed to carry their respective burdens to offer evidence to connect the dots in the string of allegations upon which each respectively relies to argue that it acted under the direction of a federal officer. Even if Express Scripts had carried its burden to present evidence establishing that it should be treated as though it, rather than ESI, contracted with DoD to provide health insurance prescription benefits for at-issue insulin products pursuant to the terms of the TRICARE contract, Express Scripts has wholly failed to make even a colorable claim that *ESI* (let alone Express Scripts) relied upon the *specific* directives of a *specific* federal officer in doing anything *at all*, much less any directives related to the cause of the injuries alleged in this case. *See Port of Corpus Christi Auth.*, 57 F.4th at 437–38 (affirming remand because the removing parties failed to show that, "by acting consistently with a federal permit," they had also "assist[ed]" or "help[ed] to carry out" the duties of a federal superior); *Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315, 2003 U.S. Dist. LEXIS 4439 (S.D. Miss. 2003) (remanding Oxycontin users' case against manufacturers and pharmacies to state court because "manufacturers did not act at direction of federal officer").

The same is true of Caremark. Caremark layers supposition upon supposition to argue that because:

- the Office of Personnel Management **("OPM") is "authorize[d]** . . . [by the Federal Employees Health Benefits Act (FEHBA)]" to contract with private carriers for federal employees' health insurance";
- **OPM "permits"** such private health insurance carriers (which Caremark dubs "FEHBA carriers" though, notably, the carriers are *private* entities, not part of a government agency) "to contract with PBMs and delegate certain responsibilities to them"; and,
- **OPM "contemplates"** that contracts between "PBMs and [such private health insurance] carriers" **might** include "Manufacturer Payments,"
- OPM's standard contract for "Experience-Rated Health Maintenance Organization [HMO] Carriers," which is publicly accessible on its website, **defines "Manufacturer Payments"** to include "any and all compensation, financial benefits, or remuneration the PBM receives from a pharmaceutical manufacturer, including . . . discounts; credits; [and] rebates," that a PBM **might receive;**

16

- **OPM imposes** some transparency standards **on the private carriers** that it contracts with for federal employees' health insurance" as well as on any PBMs that **such carriers *might* subcontract** with;
- **Caremark has four private-health-insurance-carrier clients** who contract with OPM to provide benefits for federal employees;
- **Caremark "helps administer** these benefits plans" **for such private-health-insurance-carrier clients**; and that, ostensibly,

the State of Louisiana's claims would therefore "broadly challenge [Caremark's] core services," and the State's requested relief "would impair (if not eliminate) [Caremark's] ability to deliver those services." *See* ECF Doc. 4 at ¶¶ 6-7, 13, 27 n.3 (citing FEHBA, 5 U.S.C. §§ 8901-8913, at 8902(a).

Setting aside the questionable logic of arguing that a state consumer protection enforcement action, which itself seeks *to expose and enjoin* a secret price fixing scheme, would *thwart or impede* whatever transparency or reporting requirements Caremark might have to OPM, Caremark's "federal officer" removal argument fails.  In essence, Caremark argues that by virtue of its status as a "contemplated" subcontractor of an "authorized" private carrier of health insurance benefits for federal employees, Caremark has become a "federal officer" entitled to remove to federal court an action of purely state-law claims (unrelated to Caremark's healthcare benefits services subcontract) brought by a State sovereign in state court. While Caremark claims that private health insurance carriers who manage benefits for federal employees are contractually required to "enable OPM to exercise direct oversight of certain PBM activities," the only such "federally overseen PBM activity" that Caremark can name appears to be a generic, third-party contractual expectation of the PBM's **provision** to OPM "**upon request**" of "[a]ll PBM contracts with Pharmaceutical Manufacturers." *See* ECF Doc. 4 at ¶ 9 (citing FEHB Standard Experience-Rated HMO Contract at I-19). This falls far short of specific, ongoing "direction" of Caremark by a "federal officer." *Accord, e.g.*, *Box*, 33 F.4th at 199–201; *Port of Corpus Christi Auth.*, 57 F.4th

17

at 436–38; *Plaquemines Par.*, 2022 WL 9914869, at *2–4.  Moreover, the overarching language

of the OPM FEHB contract itself places the burden to "ensure and report" the standards for "PBM

arrangements" squarely on the shoulders of the health-insurance "Carrier," *not* directly upon the

PBM.[19]  The contract wholly fails to establish any direct "relationship" between OPM and the

potential PBM subcontractor.[20]  In any case, none of Caremark's elaborate bootstrapping provides

even the arguable level of ongoing "direction" or "supervision" by a federal officer sufficient to

meet the federal-officer removal statute's "acting under" requirements.

   Both Defendants rely substantially on the Fourth Circuit's opinion in *Arlington* for the

contention that this Court should deem PBM subcontractors to be "acting under" the direction of

a federal officer.  *See Cnty. Bd. of Arlington v. Express Scripts Pharmacy*, 996 F.3d 243, 253 (4th

Cir. 2021).  Not only is the Fourth Circuit's opinion not controlling authority upon this Court, but

the *Arlington* case is also easily distinguishable on its facts from the case at bar.[21]  In *Arlington*,

the subcontractor was a mail-order pharmacy distributing opioid medications.  The plaintiff county

in that case sought "monetary damages due to harm arising from 'every opioid prescription' filled

by pharmacies." *See Arlington*, 996 F.3d at 256-57.  Not only is a county not a state with sovereign

---

[19]  *See* FEHB Standard Experience-Rated HMO Contract ("OPM FEHB Contract") at I-18, available at https://www.opm.gov/healthcare-insurance/healthcare/carriers/experience-rated.doc (last visited May 8, 2023) (cited in ECF Doc. 4 at ¶ 7).

[20] It also bears noting that neither the FEHBA statute nor the Standard FEHB Contract makes any mention of diabetes, insulin, insulin-related products, or Louisiana.  The same is true of the TRICARE statute and contract.

[21] The Fourth Circuit's *Arlington* opinion is also an outlier among federal courts in its expansive application (to administrative-services contractors/ subcontractors) of the federal officer removal doctrine—an application clearly far removed from the original purpose of the doctrine:  to protect federal officers from state and local interference as they enforced a national shipping embargo and seized illegal distilleries.  As the Fourth Circuit's *Arlington* opinion plainly demonstrates, "the combination of reliance on the private sector and the potential availability of a sovereign shield . . . (1) effectively limits the power of the consumer and the state government; and (2) upsets longstanding balances of power between consumers and companies, states and the federal government, and the executive and legislative branches."  *See* Elengold and Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 974 (2021).  Presumably for this very reason, other federal courts, including the Fifth Circuit, have declined to join in such a wildly expansive interpretation of federal-officer removal and the government-contractor-immunity defense.  This Court should similarly reject such an unfounded and ill-advised expansion of those doctrines.

immunity, but **the acts that the county challenged** (distributing medications, specifically opioids) **precisely overlapped with the defendant's contractually required acts** in that case.  By the same token, the remedy sought by the plaintiff county in *Arlington*, unlike the remedy sought by the State of Louisiana in this case, would have directly interfered with the subcontractor pharmacy's contractual obligation:  to dispense medication.  Thus, the court reasoned that the government-contractor immunity defense applied because the "contractor's obligations to the government conflict[ed] with state law such that the contractor [was not able to] comply with both."  *See Arlington*, 996 F.3d at 255.  The same cannot be said of this case.  As Louisiana has already demonstrated above, the claims and remedies sought by Louisiana have no relationship whatsoever to the Defendants' supposed obligations as subcontractors. *Cf. Plaquemines Par.*, 2022 WL 9914869, at *3–4 (distinguishing *Arlington* on the ground that the removing defendants failed to shown "that they were subjected to the federal government's guidance or control as subcontractors").

As to the "acting under" prong of the federal-officer-removal test, *Arlington* is similarly distinguishable.  In *Arlington*, the defendants' "affidavit indicate[d] the government actually exercised its audit and inspection rights with respect to the [defendants] . . . and had direct contact with [defendants'] employees." *Id.* at 253.  Defendants have failed to make such an evidentiary showing in this case.  Defendants have not produced any affidavits or even averred the existence of ongoing, back-and-forth communication with a federal officer, nor of any direct supervisory federal oversight.  Moreover, as Express Scripts points out with regard to the TRICARE contract— the required reimbursement amounts were published in a federal statute.  In other words, the contractual "mandates" that Defendants claim to have relied upon (e.g., in the case of Express Scripts, a contract derived from a federal statute that merely recites mandates from one branch of

19

the federal government (Congress) to another (the DoD) and codifies a chart of mandated co-pays) were not federal-officer "directives," but amounted instead to "nothing more than general regulations . . . regarding provision of medical services." *See Winn v. Cal. Post Acute LLC*, 532 F. Supp. 3d 892, 2021 U.S. Dist. LEXIS 67760 (C.D. Cal. 2021).[22]

Indeed, for this very reason, this case falls more logically within the holding of *Watson v. Philip Morris*, 551 U.S. 142 (2007).  In *Watson*, the Philip Morris tobacco company attempted to remove to federal court a state-court class-action lawsuit for violation of Arkansas law based upon its misrepresentations regarding "light" cigarettes, arguing that because it was subject to regulations set forth by the FTC (Federal Trade Commission), it was "acting under a federal officer" in making all of its representations regarding the tar and nicotine content of light cigarettes. The Supreme Court disagreed and denied Philip Morris' attempt at removal, holding that even heavy regulation by the federal government does not imbue requisite "acting under a federal officer" status under 28 U.S.C. § 1442(a)(1).   *Id.*

While both Defendants also rely on the *St. Charles* cases—Caremark for the assertion that it acted "pursuant to a federal officer's directions" and Express Scripts for the assertion that the alleged conduct in the State of Louisiana's case is connected with or related to an act it took pursuant to a federal officer's directions—the *St. Charles* cases are not on point either.[23]  Both *St.*

---

[22] In equating boilerplate contractual requirements with federal officer "directives," **Defendants conflate "colorable federal defense" government-contractor-immunity arguments with "acting under" federal officer direction requirements under the removal statute**. With regard to the former, discussed in greater detail *infra* at section III.B.5, the more Defendants argue that they acted as the "alter-ego" of the federal government in carrying out their sub-contractual health-plan-administration obligations (i.e., the rote implementation of contractually predetermined decisions regarding coverage, and/or charges & disbursement of medical copays and reimbursements on behalf of the federal government or its employees), the less Defendants' contractual conduct can possibly be related to the challenged conduct in this case.  The reason for this is self-evident:  The federal government itself would obviously not have falsely inflated the prices of medicines that it itself is paying on behalf of its own employees. Defendants cannot have it both ways.

[23] *See St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co. (St. Charles I)*, 935 F.3d 352, 354 (5th Cir. 2019) and *St. Charles Surgical Hosp., LLC v. La. Health Serv. & Indem. Co. (St. Charles II)*, 990 F.3d 447, 454 (5th Cir. 2021); ECF Doc. 1 at ¶ 37; ECF Doc. 4 at ¶ 27. While the *St. Charles II* Court noted that "the 'acting under'

*Charles* cases are easily distinguishable from the case at bar.  In both cases, the same private hospital sued the same private insurance carrier, Blue Cross, which had contracted directly with OPM under FEHBA to provide health insurance to federal employees.  The hospital's lawsuit arose directly from Blue Cross' actions in administering health care benefits under such FEHBA-governed plans.  The cases could not be more dissimilar from the present action in which a sovereign State sues under its own consumer protection statutes and laws in its sovereign, *parens patriae*, and own proprietary capacities to enjoin insulin and diabetes-related drug manufacturers and PBMs from engaging in illicit pricing/ rebate (i.e., kickback) schemes:  This conduct, which forms the basis for the State's suit, results in injurious *list-price* manipulation—an injury that is distinct and complete *prior to* any downstream adoption by health-plan regimes—and is therefore completely unrelated to any conduct that OPM or the DoD has ever directed, guided, or controlled.

In any case, federal-officer status alone, even if obtainable by Express Scripts under an alter-ego theory (or by Caremark under a magic wand), would be insufficient to justify Defendants' removal of Plaintiff's action.  Even if the general federal contractual obligations (under a TRICARE or OPM/ FEHB contract) could be considered specific "directives" of "federal officials," as the State demonstrates below, the State of Louisiana's claims do not arise from nor are they "related to" the acts of either ESI or of Caremark's private-insurance-carrier-clients in carrying out their respective obligations under such a contract (let alone Express Scripts' or Caremark's obligations under a subcontract).[24]   Neither PBM Defendant acted under the

---

inquiry examines the relationship between the removing party and the relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor," it also reiterated that it "**did not hold in *St. Charles I* that BCBS "acts under" the direction of OPM for all purposes.**" *St. Charles II*, 990 F.3d at 455 (quoting *St. Charles I*, 935 F.3d at 356) (emphasis added).

[24] Notably, Express Scripts has not alleged that it was acting under a DoD officer's direction in engaging in the insulin pricing scheme with other PBMs and Manufacturers.  Nor has Express Scripts shown that there was "nothing that Express Scripts knew" (or that ESI knew, for that matter) about insulin-product pricing "that the DoD officers did not also know" (e.g., that those specific federal officers who negotiated the contract with ESI and/or issued the chart listing insulin-product coverage and co-pay amounts knew the details of the insulin pricing scheme). *Cf. Ruppel v. CBS Corp.*,

"direction" of a federal officer under the meaning of the federal-officer removal statute's first prong.

4. **Neither Express Scripts Nor Caremark has Carried Its Burden to Show—Through Evidence—that the Insulin-Price-Fixing Scheme Described in Louisiana's Petition Is In Any Way Related to Any Act Ostensibly Taken Under Color of Federal Office.**

The **chief purpose** of the right of removal pursuant to § 1442(a)(1) is to "**prevent federal officers who simply comply with a federal duty from being punished by a state court for doing so**." *State of La. v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992) (citing *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969) and noting that the Court's "liberal construction of § 1442(a) is actually limited to a narrow set of circumstances") (emphasis added).  On the other hand, "a defendant might be 'acting under' a federal officer, while at the same time the specific conduct at issue may not be 'connected or associated with an act pursuant to the federal officer's directions.'" *St. Charles II*, 990 F.3d at 454.

In fact, not only do all of the State of Louisiana's claims arise solely under state law, but the claims  are completely unrelated to any ostensible "federal duty" that Defendants might have in fulfilling their contractual obligations under the TRICARE and/or OPM/FEHBA contracts.  *See* Am. Pet., ECF Doc. 1-2, at ¶¶ 9-15, 141, 176, 179–216.  As the State will prove, Louisiana diabetics were dispensed at-issue drugs and made out-of-pocket payments based on manipulatively inflated list prices generated by the Insulin Pricing Scheme, and Defendants knew that diabetics and payors, including the State, relied on those inflated list prices to pay for the at-issue drugs. ECF Doc. 1-2 at ¶¶141, 145.  Specifically, the State maintains that the Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were completely untethered

---

701 F.3d 1176 (7th Cir. 2012) (allowing removal by defendant asbestos manufacturer/installer where "**defendant acted under color of federal authority** by installing asbestos" according to Navy's "explicit[] require[ments]," **and** "**defendant showed that there was nothing it knew** about asbestos **that Navy did not**") (emphasis added); *accord Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 289 (5th Cir. 2020) (finding that the "government had the right to and did exercise supervision over the process" of asbestos installation on Navy ships).

from the actual prices that Defendants were paid for the drugs, that list prices for the at-issue drugs were detached completely from actual prices, were not remotely related to the actual price, and were artificially and arbitrarily inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer Defendants and their PBM Defendant conspirators. ECF Doc. 1-2 at ¶¶147, 148, 152, 154.  The State also maintains that Defendants affirmatively withheld the truth from Louisiana diabetics and the State, and specifically made misrepresentations in furtherance of the Insulin Pricing Scheme to induce reliance of payors and diabetics to purchase their at-issue drugs. ECF Doc. 1-2 at ¶155.  Moreover, because of Defendant's success in hiding the Insulin Pricing Scheme, no payor, including the State, knew that the drug prices resulting from the scheme were unlawfully generated.  Defendants do not assert, nor can they legitimately assert, that they were under a "federal duty" to engage in such conduct.[25]

More specifically with regard to Express Scripts, even if ESI's acts could be ascribed directly to Express Scripts, the acts it took in carrying out its administrative duties under the TRICARE contract are wholly unrelated to the State of Louisiana's claims in this case. First, Defendant's assertions rest upon the unstated and unsubstantiated presumption that every Louisiana citizen that either serves or has ever served in the U.S. armed forces (along with every Louisiana citizen that is a family member of such active service member or veteran) receives health insurance prescription benefits for at-issue insulin products exclusively pursuant to the terms of

---

[25] To the extent that the PBM Defendants similarly duped or defrauded yet another payor—i.e., the federal government—in the context of "arms-length" TRICARE-contract negotiations, into paying too much for insulin and other at-issue diabetes medications and products, or into unknowingly negotiating out-of-pocket payments based upon false list prices generated by the price-fixing scheme—and thereby unknowingly passing some of those fraudulently inflated costs through to DoD employees and their families—Defendants' "[t]he Government made me do it" argument is even more outrageous:  As every child knows, two wrongs don't make a right. *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 n.11 (5th Cir. 2010) (alteration in original) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)).  Whether or not the federal government might, in such case, have its own separate legal grounds to void its contract with ESI or otherwise seek damages based upon the Defendants' price fixing scheme is, of course, beyond the scope of this removal inquiry.  Moreover, as demonstrated *supra*, the State of Louisiana is not trying to step into the shoes of individual citizens, or of the federal government, to obtain reimbursement for charges or copays made pursuant to the TRICARE contract.

the TRICARE contract.  Moreover, the TRICARE contract that Express Scripts attaches as Exhibit
B to its Notice of Removal is a general contract that makes no specific mention of either insulin
products or of Louisiana citizens.   *See* ECF Doc. 1 at ¶ 30 (citing to the "Statement of Work,"
Section C of the contract, Exhibit B, pp. 63-121).  The same is true of the standard, generic
OPM/FEHBA contract upon which Caremark relies in its removal—a contract "governed by"
FEHBA that ostensibly has been entered into by OPM with "certain" private health-plan sponsors,
a few of which happen to be clients for which Caremark provides sub-contractual administrative
services. See ECF Doc. 4 at ¶¶ 1, 4, 6-10.

Caremark, while broadly asserting that "FEHBA 'establishes a comprehensive program of
health insurance for federal employees,'" like Express Scripts, relies upon the unstated and
unsubstantiated presumption that a certain quantifiable number of such "federal employees" are
Louisiana citizens and that those citizens receive health insurance prescription benefits for at-issue
insulin products exclusively pursuant to the terms of the OPM/FEHBA contract.  What both
Express Scripts and Caremark also ignore is that both of these types of standard federal contracts
(even assuming that a certain number of Louisiana citizens do indeed receive prescription drug
benefits exclusively pursuant to one of them) would operate in precisely the *same* way even *absent*
Defendants' illicit conduct as alleged in the State's action.  By the same token, none of the PBMs'
obligations under these contracts would be impacted in any way by the remedies sought in that
action.  In other words, because the federal contracts take as their *inputs* the list prices of the at-
issue diabetes medications, all of Defendants' challenged price-scheming conduct will necessarily
always have been completed *prior to* the ongoing administration of these federal contracts. Thus,
contrary to Defendants' sweeping assertions, there is no overlap between the State of Louisiana's
claims and the TRICARE and/or OPM/ FEHBA contracts—or Express Scripts' or Caremark's

24

ostensible respective obligations thereunder—whatsoever.  Accordingly, Defendants have failed to show that the wrongful conduct from which the State's claims arise has any relationship to any duty ostensibly "mandated" by a federal contract—much less any act "directed" by a "federal officer"—or taken under color of federal office by Defendants.

Neither Express Scripts nor Caremark can legitimately assert that their acts in fulfilling their administrative duties as subcontractors of TRICARE and/or OPM/FEHBA government contractors "related to" their conduct in carrying out the Insulin Pricing Scheme or to other conduct alleged in this case.   Not only are the actions giving rise to the State of Louisiana's claims unrelated to individual Louisiana citizens' contractual claims of any kind, (*see supra*, discussing the nature of Plaintiff's state-law claims brought in its sovereign, quasi-sovereign, and proprietary capacities), but because the rebate (kickback) pricing scheme that the PBM Defendants concocted and perpetuated with defendant manufacturers occurred and continues to occur *prior to and outside the scope of* the federal contracts, the challenged conduct has no foundation in the federal contracts at all.  Thus, the fact that the Defendants might have some *sub-contractual obligations* that might conceivably be impacted to some degree by the terms of a standard/ boilerplate/ codified federal contract (i.e., an established, preexisting contract that fails to supply any "active" or "ongoing" federal-officer "direction," as demonstrated *supra*) is irrelevant.  In removing this action to federal court, Defendants shoulder the burden of establishing such a connection between the conduct being challenged by the State's action and their federal contractual obligations.  They have failed to do so.

The facts underlying the Supreme Court's holding in *Mesa* are instructive on this point. *See Mesa*, 489 U.S. 121.  In *Mesa*, the Supreme Court held that two U.S. Postal Service employees, who had been charged in state court for traffic violations, were not permitted to remove their cases

to federal court even though they were in the course and scope of their employment when the traffic incidents occurred. *See Mesa*, 489 U.S. 121. Holding that the postal workers had not been acting under color of office during the alleged traffic incidents, the Court reasoned that a colorable federal defense is a critical element of removal and is raised only when the **defendant's act was ordered or demanded by federal authority**. *Id.* at 131-32. Quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926), another case in which the Supreme Court had rejected the removal petitions of federal officers, the *Mesa* court reaffirmed that "'[i]t must appear that the prosecution of [the officer], for whatever offense, has arisen out of the **acts done by [the officer] under color of federal authority and in enforcement of federal law**,'" and that the officer "'must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.'" *Id.* (bold emphasis added). Accordingly, the *Mesa* court rejected the officers' removal under 28 U.S.C. § 1442. *Id.* at 139. Thus, even though the *Mesa* postal workers may indeed have been "acting under" an officer or agency of the United States, they simply could raise no viable federal defense for the conduct and acts they had committed that formed the basis of the suit. *Mesa* dictates the same outcome in the case at bar.

5. **Neither Express Scripts nor Caremark Has Carried Its Burden to Establish a "Colorable" Federal Defense.**

The Supreme Court has unequivocally reaffirmed the necessity of averring a colorable federal defense as an **independent prong** required by the federal officer removal statute. *See Mesa*, 489 U.S. at 135 (concluding that "'in the performance of his duties' meant no more than 'under color of office,' and that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal"). To that end, the Supreme Court expressly held that "pure jurisdictional statutes [such as section 1442(a)] which seek 'to do nothing more than grant jurisdiction over a particular class of cases'" "**cannot independently** support Art. III 'arising

26

under' jurisdiction." *Id.* at 136-37 (quoting *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 494 (1983)) (emphasis added). "Rather," the Court went on to hold, "it is **the raising of a federal question** in the officer's removal petition **that constitutes the federal law under which the action against the federal officer arises for Art. III purposes**. **The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule** which would otherwise preclude removal even if a federal defense were alleged." *Id.* (emphasis added) (adding that "[a]dopting the Government's view would eliminate the substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems"). Indeed, if no federal question is raised in the notice of removal that would **independently** support Article III "arising under" jurisdiction, a federal defense is, by definition, not "colorable," but is instead "wholly insubstantial" and "made solely for the purpose of obtaining jurisdiction." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020) (citations omitted).

> a. *Neither of the PBM Defendants Has Carried Its Burden to Present Evidence Establishing a Colorable "Government-Contractor Immunity" Defense.*[26]

In its attempt to secure federal-officer removal jurisdiction under the "colorable federal defenses" prong of the removal statute, Express Scripts asserts the "colorable federal defenses" of government-contractor immunity and federal preemption. *See* ECF Doc. 1 at ¶¶ 42-50. "Government contractors fall within the terms of the federal officer removal statute . . . when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153 (citing *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), a case that authorized removal of a tort suit against private defense contractors that manufactured Agent Orange). Moreover, the

---

[26] As a "colorable federal defense," Caremark asserts only preemption, not government-contractor immunity. *See* ECF Doc. 4 at ¶¶ 32-37. The shortcomings and failure of Defendants' preemption defense is discussed, *infra*, at sections III.B.5.b. and III.C.3.

ordinary sale of "standardized," "off-the-shelf" consumer products is not enough to trigger the federal officer removal statute. *See Mayor of Balt. v. BP P.L.C.*, 952 F.3d 452, 464 (4th Cir. 2020) (quoting *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018)).  As Express Scripts concedes, the federal government contractor defense traditionally applies only to private suppliers of government-specified military equipment.  *See* ECF Doc. 1 at ¶ 44 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988) (admitting that the *Boyle* test "typically . . . focuses on military equipment" and weakly arguing merely the "plausib[ility] that the government contractor defense *could* apply outside the military procurement context") (emphasis added).[27]  And the government-contractor defense applies only "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. "The government contractor defense in *Boyle*, stripped to its essentials, is fundamentally a claim that the government made me do it." *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quotation omitted).

Here, Express Scripts has failed to carry its burden to establish through evidence that each element of Boyle's government-contractor defense is colorably satisfied.  What is more, Express Scripts has failed sufficiently to carry its burden to establish with evidence that it, as a separate and distinct legal corporate entity from ESI and a non-party to the TRICARE contract, has any obligations whatsoever under the TRICARE contract.[28] Even if it were contractually bound to the

---

[27] Even the flimsy argument that "[r]egardless of the context, the defense 'applies if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both' fails to get Express Scripts across the finish line on its government-contractor immunity defense as none of the remedies that the State seeks in the case at bar would even remotely interfere with Express Scripts' performance as a subcontractor under ESI's TRICARE contract.  *See* ECF Doc. 1 at ¶ 44 (citing the Fourth Circuit's outlier opinion in *Arlington*, 996 F.3d at 255 for this contention).

[28] Indeed, the express TRICARE contract language that Express Scripts cites throughout its removal notice refers exclusively to "the Contractor," not the subcontractor.  *See, e.g.*, ECF Doc. 1 at ¶¶ 33, 34 (citing Ex. B at §§ C.8.1.1, C.8.2).  While Caremark has not expressly pleaded a colorable defense of government-contractor immunity, the same

DoD, however, the type of obligations if would have under the TRICARE contract are not the type carried out by those government contractors typically accorded immunity under the narrow government-contractor-immunity defense.[29] Clearly, the administration of the TRICARE health program is completely unrelated to a traditional department of defense function.  The DoD is a military-focused executive-branch department, not a health or social services department. The TRICARE contract does not call upon ESI to build anything for or supply anything to the military. The terms of the contract do not relate to military specifications or unique military needs or functions of any kind.  Nor is administering a health care plan "an area of uniquely federal interest."  *Cf. Boyle*, 487 U.S. at 504-07, 511-13 (1988) (conducting a federal-government-contractor-defense inquiry similar to the traditional implied preemption inquiry).  Instead, as Express Scripts freely admits, ESI's contractual responsibilities essentially amount to general clerical, administrative, bursar-related responsibilities that serve no uniquely government-related function.

Furthermore, the more Defendants argue that they acted as the "alter-ego" of the federal government in carrying out their sub-contractual health-plan-administration obligations (i.e., the rote implementation of contractually predetermined decisions regarding coverage, and/or charges & disbursement of medical copays and reimbursements on behalf of the federal government or its

---

is true of Caremark with regard to the OPM contract:  Caremark readily admits that its insurance-carrier clients are the contracting parties to the OPM contract, not Caremark.  Thus, neither Defendant has presented a colorable government-contractor immunity defense with regard to their respective role as subcontractor under either the DoD/TRICARE contract or the OPM/FEHBA contract. Nor, for that matter, does the State of Louisiana allege that it has any rights under the TRICARE or OPM/FEHBA contracts or try to assert such rights by stepping into the shoes of individual citizens.  *See*, *supra*, regarding the proprietary, quasi-sovereign, and sovereign nature of the claims brought by the State.

[29] Express Scripts argues throughout its notice, for example, that it "serves as only a 'fiscal intermediary on behalf of DoD to pay for all authorized pharmaceutical and supplies'" that the TRICARE contract essentially details merely how "'the Government will be acquiring covered drugs with Government funds for use by the Government' when a TRICARE prescription is dispensed," and that "[t]hese requirements" as well as "the precise cost-sharing amounts for the years 2018 through 2027" are all "mandated [and statutorily codified] by Congress."  *See* ECF Doc. 1 at ¶¶ 31-32 (citing 10 U.S.C. §§ 1074g(a)(2)(A), 1074g(a)(6)(A) (codified cost-sharing table), 1074g(b)).

employees), the less Defendants' contractual conduct can possibly be related to the challenged conduct in this case. In other words, Defendants cannot logically argue these two prongs of the removal statute both ways: If Defendants choose to argue that they are the federal government's "alter ego" with respect to all of their contract-related conduct, then the conduct that is the subject of the State's lawsuit cannot possibly be "related to" that contract-related conduct. The reason for this is self-evident: The federal government itself would obviously not have falsely inflated the prescription-drug prices that it itself is paying on behalf of its own employees. Defendants' insulin price-fixing scheme falls so far outside the parameters of what any federal authority would ever order that the conduct cannot possibly give rise to a colorable government-contractor defense.[30] Defendants cannot have it both ways. Accordingly, Express Scripts' asserted colorable federal "government-contractor immunity" defense fails.

> b. *Neither of the PBM Defendants Has Carried Its Burden to Present Evidence Establishing a Colorable Preemption Based Defense.*

By the same token, neither Express Scripts nor Caremark has even remotely demonstrated that either the federal TRICARE or FEHBA statute expressly and completely preempts all of Plaintiff's state law claims. *See* ECF Doc. 1 at ¶¶ 49-50. Indeed, even the "jurisdictional grant" of 28 U.S.C. §1442(a) continues to be limited "by restrictions placed on federal-court jurisdiction by Article III of federal Constitution." *See, e.g., Gilberg v. Stepan Co.*, 24 F. Supp. 2d 325 (D.N.J. 1998) (remanding case). Moreover, the Supreme Court's recent analysis and rejection of PBMs' similar preemption arguments based upon similarly broad "relates to" language in the ERISA statute likewise bars a conclusion that the State's claims are preempted by either federal statute asserted

---

[30] Moreover, because the Defendants' wrongful inflation of insulin list prices preceded the federal contracts and was unknown to the federal government, that illicit price inflation was actually "baked in" to the federal government's own pricing charts, Defendants should be estopped from asserting any sort of "[t]he Government made me do it" defense. *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 n.11 (5th Cir. 2010) (alteration in original) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)).

in the case at bar.[31] Under any analysis, as set forth more fully at section "C" below, Defendants

have failed to prove that this Court has subject matter jurisdiction over the present action through

federal preemption of the State of Louisiana's claims.[32]

## C. <u>Remand is Constitutionally Required Due to Lack of Subject Matter Jurisdiction.</u>

"Federal courts are courts of limited jurisdiction 'hav[ing] only the authority endowed by the

Constitution and that conferred by Congress." *United States v. Hazlewood*, 526 F.3d 862, 864 (5th

Cir. 2008) (quoting *Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir. 1981)); *see also*

28 U.S.C. § 1441(a). Federal courts have original jurisdiction where either a federal question is

presented, or complete diversity of citizenship exists among the parties. *See* 28 U.S.C. §§ 1331,

1332.  Removal jurisdiction is limited to the scope of original jurisdiction. *See* 28 U.S.C. § 1441(a);

*Baris v. Sulpicio Lines, Inc.*,932 F.2d 1540, 1546 (5th Cir. 1991) (noting that "original subject

matter jurisdiction is not waivable"); *Mesa v. California*, 489 U.S. 121, 136 (1989) (noting that

"Section 1442(a) . . . is a pure jurisdictional statute" that "cannot independently support Art. III

'arising under' jurisdiction").

### 1. The Federal TRICARE and FEHBA Statutes Provide No Causes of Action and Plaintiff's Well-Pleaded Complaint Raises No Claims Related to the Statutes.

As set forth, *supra,* Plaintiff's Petition alleges only state law claims. *See* ECF Doc. 1-2.  As

the Court lacks subject matter jurisdiction over this action, the Court should remand the case

without considering the merits of Defendants' affirmative defense of TRICARE/ FEHBA statutory

preemption.  Even a cursory examination of the federal TRICARE and FEHBA statutes reveals

that those statutes are incapable of conferring independent jurisdictional basis for the federal

---

[31] *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S.Ct. 474; 208 L. Ed. 2d 327; 2020 U.S. LEXIS 5988 (2020) (declining to accord the preemptive language of ERISA (the Employee Retirement Income Security Act of 1974) such broad preemptive scope vis-à-vis state law), discussed *infra* at section C.3..

[32] The State also notes that because the federal-officer removal statute does not apply, removal on any other grounds would require the consent of the PBM Defendants' co-defendants.  *See* 28 U.S.C. §§ 1441.

court's retention of this case, because they provide no cause of action at all. *See* ECF Doc. 1 at 12, ¶49 (conceding that the TRICARE statute **provides authorization**, not a cause of action). The discrete power that the TRICARE statute confers upon the Secretary of Defense, for example, is expressly limited to the authorization "to enter into group health-insurance contracts." *Id.* The statutory provision that Express Scripts deems to be an "express preemption provision," while it purports to proscribe application of certain state or local laws or regulations—i.e., those "**relating to** health insurance, prepaid health plans, or other health care delivery or financing methods" (arguably an unconstitutionally broad overreach[33])—"to any contract entered into pursuant to this chapter by the Secretary of Defense," **provides no cause of action**. *See id.* The FEHBA statute provides similarly circumscribed authorization to the OPM. As the TRICARE and FEHBA statutes fail to provide *any* cause of action, they certainly cannot be construed to provide an *exclusive* cause of action for claims that fall within their scope.[34]

Federal district courts are vested with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. To determine whether a case "arises under" federal law, the court must apply the "'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."[35] *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted); *see also Anderson v. American Airlines, Inc.*, 2 F.3d 590, 593 (5th Cir.

---

[33] *See Cal. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335-36 (1997) (Scalia, J., concurring) (observing that "applying the 'relate to' provision [in the Employee Retirement Income Security Act] according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else" and concluding therefore that "[t]he statutory text provides an illusory test, unless the Court is willing to decree a degree of pre-emption that no sensible person could have intended--which it is not") (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).

[34] To the extent that Defendants suggest otherwise, they would seem to confuse complete preemption with field preemption. *See, e.g., Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 276-77 (2d Cir. 2005).

[35] As noted above, the federal-officer removal statute is a pure jurisdictional statute that, if applicable, merely allows federal officers to circumvent the well-pleaded complaint rule by allowing federal questions necessary for federal court jurisdiction to enter cases by way of defense.

1993) (observing that"[i]t is axiomatic that the plaintiff is the master of his or her complaint"). "A federal question 'is presented' when the complaint invokes **federal law as the basis for relief**." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003) (emphasis in the original).  Indeed, it is "well settled that the federal question upon which [a party] relies for original federal jurisdiction, or . . . for removal jurisdiction, must not have entered the case by way of defense." *See First Nat'l Bank of Aberdeen v Aberdeen Nat'l Bank*, 627 F.2d 843 at 850 (8th Cir. 1980).  This case presents no federal question.  Absent proof of removability on federal-officer-removal grounds, whereby the TRICARE and FEHBA statutes might have entered the case by way of Defendants' affirmative defense to the State's claims, the TRICARE and FEHBA statutes cannot provide legitimate basis for subject matter jurisdiction.  Accordingly, the Court should remand this case back to state court. *See* 28 U.S.C. § 1447(c).

> **2.  The TRICARE and FEHBA Statutes Provide No Complete Preemption of State Law Claims that Would Justify an Exception to the Well-Pleaded Complaint Rule.**

Other than through assertion of the federal-officer removal statute (which fails for reasons already set forth above), Defendants' TRICARE/ FEHBA claims can confer independent grounds for federal jurisdiction by way of defense *only if* the respective federal statute "wholly displaces" Plaintiff's state law causes of action.  In other words, complete preemption provides the only narrow exception to the well-pleaded complaint rule.  Though the Court ordinarily should not look beyond the pleadings to consider the merits of Defendants' affirmative statutory preemption defenses,[36] even a cursory review of the statutes reveals that **neither statute completely preempts, either expressly or impliedly, Plaintiff's state law claims**.

---

[36] *See Carlson v. Arrowhead Concrete Works, Inc.*, 445 F.3d 1046, 1050 (8th Cir. 2006) (noting that the court "must be satisfied that it has jurisdiction before it turns to the merits of other legal arguments") (string citation omitted).

In determining the existence and reach of preemption, "the purpose of Congress is 'the ultimate touchstone.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 (1963)). **Congress can show its purpose in one of two ways**, **either expressly or impliedly**. Congress may "indicate pre-emptive intent through a statute's **express language <u>or</u>** through its **structure and purpose**." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 129 S. Ct. 538, 543, 172 L.Ed.2d 398, 405 (2008) (emphasis added) (citation omitted).  When preemption does exist it is usually quite limited; complete preemption is exceedingly rare.  Indeed, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences* LLC, 544 U.S. 431, 449, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005)); *See also Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010).

   *a. Any Affirmative Defense Based Upon Express Complete-Preemption Fails.*

Only a very small minority of federal statutes have ever been held to authorize "complete preemption" of state law claims, and neither the TRICARE nor the FEHBA statute  are among them.[37]  Moreover, to the extent that either statute's preemption clause encroaches upon the state's traditional police powers (e.g., by limiting the State's right to redress the illicit and exorbitant

---

[37]The small minority of federal statutes ever held to completely preempt state law all pertain either to interstate commerce, banking, or transportation – regulatory fields traditionally occupied by the federal government. Among these are the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C.A. § 185 (extending federal district court jurisdiction to all "suits for violation of contracts"), the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(f) (providing that federal district courts "shall have jurisdiction . . . in any action . . ."), and the National Bank Act, 12 U.S.C. §§ 85-86. Not only do these federal statutes pertain to regulatory fields traditionally occupied by the federal government, but even their broad, "complete" express-preemption clauses do not have infinite reach.  *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995) (noting that "state laws that indirectly affect ERISA plans are not preempted") (cited with approval in *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141. S.Ct. 474, 480; 208 L. Ed. 2d 327, 335; 2020 U.S. LEXIS 5988,***10 (2020) (concluding that "not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan" and noting that "[t]he logic of *Travelers* decide[d] th[e] case).  Notably, none of them implicates the State's inherent police power authority to protect the health and welfare of its citizens.

34

pricing of drugs critical to its citizens' health, as well as the related financial loss/ physical harm to citizens resulting therefrom), **the preemption clause must be strictly construed**. Indeed, neither the TRICARE statute nor FEHBA discloses a "clear and manifest purpose of Congress" to supersede "the historic police powers of the States."[38]  *See Altria Group*, 555 U.S. at 77 (citation and internal quotation marks omitted). Thus, whether couched as provided a distinct basis for federal subject matter jurisdiction, or just satisfying the "colorable federal defense" requirement of federal-officer removal, these statutes are incapable of supporting removal jurisdiction. There is no complete preemption, nor is there any colorable federal defense based on these statutes.

        *b.  Any Affirmative Defense Based Upon Implied Complete-Preemption Also Fails.*

For the sake of being thorough, Louisiana herein also addresses implied preemption. Under the doctrine of implied preemption, state law claims may be barred through inference of preemptive intent "if the **scope** of the statute **indicates** that Congress intended federal law to **occupy the legislative field**, or if there is an **actual conflict** between state and federal law." *Altria Group, Inc.*, 555 U.S. at 76-77 (citation omitted) (emphasis added); *see also Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 442 (5th Cir. 2001).  Again, the "historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group*, 555 U.S. at 77 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) (internal quotation marks omitted)).  Such historic police powers include the power to uphold laws that protect and maintain the health, safety, and general welfare of citizens.  *See Barbier v. Connolly*, 113 U.S. 27, 31-32, 5 S. Ct. 357, 359-60, 28

---

[38] *See also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 518 (1992) (emphasizing the "presumption against the pre-emption of state police power regulations"); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740 (1985) (resting on the presumption that "Congress did not intend to pre-empt areas of traditional state regulation"); *Hillsborough County, Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707, 715 (1985) (identifying "the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause").

L.Ed. 923, 924-25 (1885); *see also Medtronic, Inc. v. Lohr*, 518 U.S. at 475. The presumption against encroaching upon the State's historic police powers is relevant even when the federal statute contains an express preemption clause. *See Altria Group*, 555 U.S. at 77.

As the State of Louisiana bring this action in its sovereign, quasi-sovereign, and proprietary capacities, its action may not be preempted "unless that was the clear and manifest purpose of Congress." *See Altria Group*, 555 U.S. at 77 (citations and internal quotation marks omitted). Indeed, the Supreme Court has expressly declined to hold that a state law that expressly regulated the conduct of Pharmacy Benefit Managers was preempted, even under the sweepingly broad "relate to" language of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S.Ct. 474, 479; 208 L. Ed. 2d 327, 334; 2020 U.S. LEXIS 5988 at 8 (2020) (declining to accord broad preemptive scope to ERISA even though it expressly preempts "'any and all State laws insofar as they may now or hereafter **relate to any employee benefit plan**' covered by ERISA") (citing ERISA, 29 U.S.C. §1144(a)) (emphasis added). By analogy, the similar preemptive language of the TRICARE and FEHBA statutes could not reasonably be held to preempt the state laws that form the basis for Plaintiff's claims in the case at bar.

In *Rutledge*, the Supreme Court found that an Arkansas law designed to protect the survival of independent pharmacies by "tether[ing] reimbursement rates to pharmacies' acquisition costs" and specifically "requir[ing] PBMs to reimburse Arkansas pharmacies at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler," was not preempted by ERISA's broad preemption clause. *Id.*, 141 S.Ct. at 479; 208 L.Ed. at 333-34; 2020 U.S. LEXIS 5988 at 7. In reaching its holding, the *Rutledge* Court first defined a state law that "relates to" a health plan as one that "'has a connection with or reference to such a plan.'" *Id.*, 141 S.Ct. at 479;

36

208 L.Ed. at 334; 2020 U.S. LEXIS 5988 at 8.  The Court next observed that "[c]rucially, not every

state law that affects an ERISA plan or causes some disuniformity in plan administration has an

impermissible connection with an ERISA plan. That is especially so if a law merely affects costs."

*Id.*, 141 S.Ct. at 480; 208 L.Ed. at 335; 2020 U.S. LEXIS 5988 at 10 (citing *In New York State*

*Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U. S. 645 (1995)).

Accordingly, "state rate regulations that merely increase[d] costs or alter[ed] incentives for [health]

plans without forcing plans to adopt any particular scheme of substantive coverage," were held not

to be impermissibly "related to" the health plans and were therefore not preempted. *Id.*, 141 S.Ct.

at 480; 208 L.Ed. at 336; 2020 U.S. LEXIS 5988 at 11.

 *Rutledge* dictates the same outcome here.  While the TRICARE and FEHBA statutes

contain "relate to" language in their preemption provisions similar to the statutory language at

issue in *Rutledge*, those statutes *also* contain limiting language that actually *curtails the preemptive*

*reach* of those statutes.  For example, while the "express preemption provisions" of the TRICARE

section cited by Express Scripts provide  that "[a] law or regulation of a State or local government

**relating to health insurance, prepaid health plans, or other health care delivery or financing**

**methods** shall not apply to any contract entered into pursuant to this chapter by the Secretary of

Defense," the ensuing subsections and accompanying regulations provide that the state laws are

preempted ***only to the extent that*** they are  **"inconsistent with a specific provision of the**

**contract," or preemption is "necessary to implement or administer . . . the contract," or** is

"necessary **to achieve important Federal interests . . . that have a direct and substantial effect**

**on the conduct of military affairs and national security** policy of the United States."  *See* ECF

Doc. 1 at ¶ 49; 10 U.S.C. § 1103(a); 32 C.F.R. § 199.17(a)(7) (emphasis added).  Notably, among

these "important Federal interests," the statute specifically lists "the operation of such programs at

the lowest possible cost to the Department of Defense." 32 C.F.R. § 199.17(a)(7)(i).  The statute also *exempts from preemption* any state "taxes, fees or other payments [that] are *applicable to a broad range of business activity*." 32 C.F.R. § 199.17(a)(7)(iii) (emphasis added).  Absolutely nothing in the State's claims or requested remedies—broadly aimed at protecting consumers, preventing monopolies, and protecting the health, safety, and welfare (physical and economic) of the State's populace—even if fully granted, would interfere in any way with the Secretary of Defense's "authorization . . . to enter into [or "implement or administer"] group health-insurance contracts" nor with the conduct of military affairs.  *Cf.* ECF Doc. 1 at ¶ 49.  Just as in *Rutledge*, one of the States's overarching goals is fair and transparent prescription drug pricing.  Not only are the state laws applicable to a broad range of business activity, but the State's successful protection of these interests would actually *serve* the important federal interest of lowering healthcare costs for the Department of Defense and its employees.

The "relates to" preemptive language of the FEHBA statute cited by Caremark is even narrower, as only **contractual terms** that "**relate to the nature, provision, or extent of coverage or benefits**" have any preemptive power under that preemption clause, and such contractual terms only preempt state laws which also "relat[e] to health insurance or plans."  *See* ECF Doc 4 at ¶ 34 (citing 5 U.S.C. §8902(m)(1)).

Clearly, eradicating an illicit pricing scheme between PBMs and insulin manufacturers would have no bearing whatsoever on the "nature, provision, or extent of coverage or benefits" for federal employees, and would actually *reduce* overall healthcare costs.   Nor do the consumer protection or anti-monopoly statutes or historic police powers of the State "make reference to" or have any "connection with" "health insurance or plans."  *See Rutledge*, 141 S.Ct. at 479; 208 L.Ed. at 334; 2020 U.S. LEXIS 5988 at 8.  Finally, the "relationship" between the state laws that provide

the basis for Plaintiff's claims and Caremark's ostensibly "conflicting" sub-contractual "obligations" under the OPM/ FEHBA contract are even more attenuated than the relationship between the ERISA statute and the Arkansas reimbursement-rate regulation at issue in *Rutledge*— a regulation that applied across-the-board to *all* PBMs. As already discussed *supra*, Caremark is not even a party to an OPM/FEHBA contract—the contract that Caremark essentially cites as the federal "law" that ostensibly conflicts with and preempts the State's consumer protection/ *parens patriae* action. Moreover, as Caremark concedes, OPM's standard-issue contract merely "authorizes" PBM financial negotiation and manufacturer payment collection, the contract does not mandate any transactions. *See* ECF Doc 4. at ¶¶ 35, 37. As such, the FEHBA-authorized OPM contract simply cannot be colorably considered a preemptive federal "law" as applied to the State's causes of action against Caremark in the case at bar.

In sum, under *Rutledge*, no actual conflict exists between state and federal law in the case at bar, nor have Defendants demonstrated that any Congressional intention to "occupy the legislative field" of state consumer protection and historic, *parens patriae* police powers could reasonably be inferred from the language of the TRICARE or FEHBA statutes. Defendants' misguided notions about the preemptive reach of TRICARE and FEHBA (and any contracts authorized thereunder) are rooted in wishful thinking rather than legal principle. To hold otherwise would be to unjustifiably deem two narrow, federal statutes pertaining to the health plans of a discrete group of federal employees to have significantly and single-handedly changed the landscape of federal preemption law. The Court should decline to give these statutes such radically expansive application and hold that the asserted preemption defenses do not satisfy the "colorable federal defense" requirement of federal-officer removal, nor provide a distinct basis for federal subject matter jurisdiction.

## IV.   **CONCLUSION**

The Court should reject the PBM Defendants' efforts to "recast private healthcare companies as deputies of the federal government." *Mitchell*, 28 F.4th at 591. The State of Louisiana, as a sovereign power and as the master of its own complaint, was at liberty to bring its action against the Defendants in state court. And in state court should this state-centric suit stay. A contrary holding would create a constitutionally indefensible encroachment on sovereign immunity and a constitutionally insupportable and unsustainable expansion of federal preemption law.  Defendants have failed to satisfy their burden of demonstrating that removal is proper.

For these and all of the foregoing reasons, Louisiana respectfully requests the Court to GRANT Plaintiff's Motion to Remand, and to REMAND this case in its entirety to the 19th Judicial District Court for East Baton Rouge Parish, Louisiana.

**Respectfully submitted,**

JEFF LANDRY, ATTORNEY GENERAL FOR THE STATE OF LOUISIANA
Nicholas J. Diez, No. 31701
Matthew P. Stafford, Jr., No. 32706
Medicaid Fraud Control Unit
Mike Dupree, No. 26870
Public Protection Division
Office of the Attorney General, State of Louisiana
1885 North 3rd Street
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6468
Facsimile: (225) 326-6499
diezn@ag.louisiana.gov
staffordm@ag.louisiana.gov
dupreem@ag.louisiana.gov

  */s/ John Alden Meade*
John Alden Meade, No. 29975
Meade Young, LLC

40

400 Poydras Street, Suite 1680
New Orleans, Louisiana 70130
T: 504-382-6283
F: 504-717-2846
E: jam@meadeyoung.com

Robert L. Salim, No. 11663
Lisa Causey-Streete, No. 33767
Salim-Beasley LLC
1901 Texas Street
Natchitoches, LA  71457
T: 318-352-5999
F: 318-352-5998
E: skeeter@salim-beasley.com
E: lcausey@salim-beasley.com

Jerald P. Block, No. 3151
Block Law Firm, APLC
422 East 1st Street
Post Office Box 108
Thibodaux, LA  70301
T: 985-446-0418
F: 985-446-0422
E: jpb@blocklawfirm.com

Eulis Simien, Jr., No. 12077
Jimmy Simien, No. 1598
Roy Bergeron, Jr., No. 33726
Simien & Simien, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, Louisiana 70809
T: 225-932-9221
F: 225-932-9286
E: eulissimien@simien.com
E: jimmysimien@simien.com
E: roybergeron@simien.com

*Attorneys for Plaintiff State of Louisiana*