# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| STATE OF LOUISIANA,<br><br>        *Plaintiff,*<br><br>  v.<br><br>SANOFI-AVENTIS U.S. LLC, *et al.*,<br><br>        *Defendants.* | Civil Action No. 3:23-cv-00302-BAJ-SDJ<br><br>Removed from Case No. C-729791, 19th JUDICIAL DISTRICT COURT, PARISH OF EAST BATON ROUGE |

## CAREMARKPCS HEALTH, L.L.C.'S MEMORANDUM IN OPPOSITION TO THE STATE'S MOTION TO REMAND

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

PROCEDURAL HISTORY.......................................................................................... 6

LEGAL STANDARD................................................................................................... 7

ARGUMENT .............................................................................................................. 9

I.      Caremark Meets the Requirements of Section 1442(a)(1). ................................. 9

        A.      Caremark Acted Under the Direction of a Federal Agency in
                Administering the Health Benefits Program for Federal Employees. ....................9

        B.      The State's Claims Are Related to Caremark's Federal PBM Services. ...............13

        C.      Caremark Has a Colorable Federal Defense. ........................................................16

II.     The State Is Not Exempt from Section 1442(a)(1). .........................................18

        A.      The State's *Parens Patriae* Status Does Not Justify Remand. ............................18

        B.      The State Is Not Entitled to Sovereign Immunity.................................................20

CONCLUSION...........................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) ........................................................................17

*Alden v. Maine*, 527 U.S. 706 (1999) .........................................................................................20

*Ames v. Kansas*, 111 U.S. 449 (1884) ........................................................................................20

*Anesthesiology Assocs. of Tallahassee v. Blue Cross Blue Shield of Fl., Inc.*, 2005 WL 6717869 (11th Cir. Mar. 18, 2005) ......................................................................................10

*Arizona v. Maypenny*, 451 U.S. 232 (1981) ...............................................................................7, 8

*Bell v. Thornburg*, 743 F.3d 84 (5th Cir. 2014) .......................................................................9, 13

*Box v. Petrotel, Inc.*, 33 F.4th 195 (5th Cir. 2022) .......................................................................13

*California ex rel. Lockyear v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004) .............................21, 23

*California v. Steelcase, Inc.*, 792 F. Supp. 84 (C.D. Cal. 1992) ....................................................23

*Carter v. Westlex Corp.*, 643 F. App'x 371 (5th Cir. 2016) ............................................................8

*Cnty Bd. of Arlington Cnty v. Express Scripts Pharm., Inc.*, 996 F.3d 243 (4th Cir. 2021) ....10, 12

*Coventry Health Care, Inc. v. Nevils*, 581 U.S. 87 (2017) .............................................................3

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237 (9th Cir. 2017) ....................................................................................................................10

*Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., Inc.*, 625 F.2d 22 (5th Cir. 1980) .........21

*Illinois v. Milwaukee*, 406 U.S. 91 (1972) .................................................................................20

*In re Flonase Antitrust Litig.*, 879 F.3d 61 (3d Cir. 2017) ...........................................................21

*In re Katrina Canal Litig. Breaches*, 524 F.3d 700 (5th Cir. 2008) ........................................21, 22

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112 (2d Cir. 2007) ...................................................................................................................21, 22

*In re Oil Spill by Oil Rig Deepwater Horizon*, 747 F. Supp. 2d 704 (E.D. La. 2010) ..................22

*Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224 (8th Cir. 2012) ...............................3, 10, 11

*Jackson v. Avondale Industries Inc.*, 469 F. Supp. 3d 689 (E.D. La. 2020) ..............................8, 9

*Jefferson Cnty v. Acker*, 527 U.S. 423 (1999) ........................................................................14, 18

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) ...................................... *passim*

*Louisiana v. Sparks*, 978 F.2d 226 (5th Cir. 1991) .........................................................................8

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) ............................................................................15

*Mesa v. California*, 489 U.S. 121 (1989) ...............................................................................15, 16

*Moore ex rel. Mississippi v. Abbott Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995) ........22

*Neal v. Ameron Int'l Corp.*, 495 F. Supp. 3d 375 (M.D. La. 2020) ................................................8

*Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*, 359 F.3d 1237 (10th Cir. 2004) ....................................................................................................................................21

*Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) .......12, 13

*Port of Corpus Christi Auth. v. Port of Corpus Christi L.P.*, 57 F.4th 432 (5th Cir. 2023) ..........13

*Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed. Cir. 1997) ................21

*Rutledge v. Pharmaceutical Care Management Association*, 141 S. Ct. 474 (2020) ...................18

*St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 935 F.3d 352 (5th Cir. 2019) ........................................................................................................................ *passim*

*St. Charles Surgical Hosp. v. La. Health Serv. & Indem. Co.*, 990 F.3d 447 (5th Cir. 2021) ........................................................................................................................ *passim*

*Tennessee v. Davis*, 100 U.S. 257 (1879) ....................................................................................22

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) .....................................................14, 16, 17, 20

*Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, 2023 WL 2573914 (5th Cir. Mar. 20, 2023) ...............................................................................................................12, 13

*Virginia ex rel. Kilgore v. Bulgartabac Holding Grp.*, 360 F. Supp. 2d 791 (E.D. Va. Mar. 3, 2005) ....................................................................................................................22

*Wages and White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ...................17

*Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007) ...................................................... *passim*

*Webb v. 3M Co.*, 627 F.3d 612 (S.D. Miss. Sept. 13, 2022) ..........................................................8

*Williams v. Lockheed Martin Corp.*, 990 F.3d 852 (5th Cir. 2021) ...........................................9, 13

iii

*Zeringue v. Crane Co.*, 846 F.3d 785 (5th Cir. 2017)...........................................................9, 11, 16

## CONSTITUTION AND STATUTES

5 U.S.C. § 8902(a) ...........................................................................................................3

5 U.S.C. § 8902(m)(1) ..........................................................................................16, 17, 18

28 U.S.C. § 1442(a)(1)............................................................................................... *passim*

28 U.S.C. § 1446(a) ...........................................................................................................8

Class Action Fairness Act....................................................................................................21, 22

Employee Retirement Income Security Act ..........................................................................18

Federal Employee Health Benefits Act, 5 U.S.C. § 8901 *et seq.*............................................ *passim*

Louisiana Monopolies Act, La. R.S. § 51:121 *et seq.* ....................................................................7

Louisiana Unfair Trade Practices Act, La. R.S. § 51:1401 *et seq.* .................................................7

Medical Assistance Programs Integrity Act, La. R.S. § 46:437.1 *et seq.*. .......................................7

U.S. CONST. amend XI ...........................................................................................................20

Pub. L. No. 112-51, 125 Stat. 545 (codified at 28 U.S.C. § 1442(a)(1))...........................................13

## OTHER AUTHORITIES

14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3721
(4th ed. 2023)...................................................................................................................21

Office of Personnel Management, *Federal Employee Health Benefits Program and
Medicare* (2008), https://www.opm.gov/healthcareinsurance/healthcare/medicare/75-
12-final.pdf.......................................................................................................................3

## **INTRODUCTION**

CaremarkPCS Health, L.L.C. ("Caremark") is a pharmacy benefit manager ("PBM"). Health plan sponsors contract with Caremark and other PBMs for a range of valuable services, one of which is to negotiate with pharmaceutical manufacturers for drug rebates.  Rebates are vitally important to Caremark's health-plan clients because they reduce the net cost of drugs.  Among the clients for whom Caremark contracts and obtains rebates are sponsors of plans that provide health-insurance benefits to federal government employees.  Those plans are governed by the Federal Employees Health Benefits Act, or "FEHBA."  Under FEHBA, federal regulators explicitly authorize PBMs to negotiate rebates on behalf of sponsors of FEHBA plans ("FEHBA Carriers") and impose contractual obligations requiring PBMs to report those rebates and pass them through to the plans themselves.

This lawsuit challenges Caremark's rebate-negotiation practices.  Louisiana alleges that Caremark's negotiations with insulin manufacturers—including negotiations for rebates passed through to FEHBA plans—are, in reality, an unlawful scheme to raise the list price of insulin. Based on that course of conduct, which applies equally to FEHBA and non-FEHBA plans, Louisiana seeks restitution and disgorgement for alleged overpayments made by Louisianan diabetics and to enjoin Defendants from engaging in the alleged "Insulin Pricing Scheme."  Am. Compl. at pp. 45-46.

Removal is appropriate because the conduct the State challenges and the relief it seeks run headlong into the work Caremark performs under the direction and supervision of the Office of Personnel Management ("OPM") to help administer federal employee health benefits.  Indeed, the Fifth Circuit already has held that entities administering FEHBA plans are entitled to federal officer removal.  *See St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co. (St. Charles I)*, 935 F.3d 352 (5th Cir. 2019).

1

The State's attempts to avoid this binding caselaw are inconsistent with its own claims and fail as a matter of law.  For example, the State contends that federal agencies do not direct Caremark to do "anything at all," but simultaneously identifies a laundry list of OPM requirements governing Caremark's conduct.  The State also claims there is "no overlap" between its allegations and the standard FEHBA contract, but simultaneously concedes that it brought this lawsuit on behalf of Louisianan diabetics who obtain insulin under that very contract.  The State also attempts to litigate Caremark's federal defense on the merits, but ignores that Caremark is entitled to a federal forum to litigate that defense.  Finally, the State's argument that its sovereign status exempts it from the ordinary rules of officer removal ignores centuries of Supreme Court precedent holding that federal officers may litigate federal defenses in federal court, even when they face claims brought by sovereign states under state law.

The State cannot avoid the simple reality that its claims arise out of conduct that impacts FEHBA and non-FEHBA clients alike.  Caremark's at issue conduct—negotiating with manufacturers, obtaining rebates, and passing those rebates on to its clients—is not client specific.  Caremark negotiates with manufacturers and obtains rebates for its FEHBA and non-FEHBA clients ***in the same negotiations***.  Because Caremark undertakes that conduct under the direction of OPM and subject to FEHBA's strictures, Caremark has a colorable federal defense that it is entitled to litigate in federal court.

## **BACKGROUND**

The federal government is the nation's largest employer.[1]  OPM administers federal employment functions and provides federal employment benefits pursuant to the Federal

---

[1] *Federal Employers*, U.S. Dep't of Labor, https://www.dol.gov/agencies/odep/program-areas/employers/federal-employment (last visited June 22, 2023).

Employee Health Benefits Act, which "establishes a comprehensive program of health insurance for federal employees." *Coventry Health Care, Inc. v. Nevils*, 581 U.S. 87, 91 (2017) (citation omitted). Congress's purpose in enacting FEHBA "was to establish a health benefits program for federal employees, so as to compete for the best talent along with private companies." *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1232 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532 (2021). According to FEHBA's sponsors, the availability of the program would "be of material assistance in improving the competitive position of the Government," and instrumental in retaining a quality civil service "so urgently needed to assist in maintaining and improving our strong national defense and in the operation of other essential Government programs." *Id.* at 1232-33 (quoting H.R. Rep. No. 86–957, at 2 (1959); 1959 U.S.C.C.A.N. 2913, 2914).

To carry out these goals, FEHBA "assigns to OPM broad administrative and rulemaking authority over the program," *Coventry Health Care, Inc.*, 581 U.S. at 91 (citing 5 U.S.C. §§ 8901-8913), and authorizes OPM to contract with FEHBA Carriers for federal employees' health insurance, 5 U.S.C. § 8902(a). Prescription drug coverage is one of the essential health benefits that FEHBA Carriers are required to provide to federal employees. OPM, *Federal Employee Health Benefits Program and Medicare* 3 (2008), https://www.opm.gov/healthcare-insurance/healthcare/medicare/75-12-final.pdf. OPM expressly contemplates that FEHBA Carriers will employ PBMs, like Caremark, to administer that component of the benefits. OPM also expressly anticipates that such contracts will include "Manufacturer Payments," which it defines broadly to mean "any and all compensation, financial benefits, or remuneration the PBM receives from a pharmaceutical manufacturer, including but not limited to, discounts; credits; rebates, regardless of how categorized; market share incentives, chargebacks, commissions, and

administrative or management fees" as well as "any fees received for sales of utilization data to a pharmaceutical manufacturer." OPM, Federal Employees Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers, at I-18 (2019) ("FEHB Standard Contract"), https://www.opm.gov/healthcare-insurance/healthcare/carriers/experience-rated.doc.

Although OPM does not directly contract with PBMs, it imposes myriad obligations on the PBMs that contract with FEHBA Carriers by requiring those carriers to include specific provisions in all PBM contracts. Ex. A, Declaration of M. Oesterle ("Oesterle Decl.") ¶¶ 4-7. OPM requires that PBMs "provide pass-through transparent pricing based on the PBM's cost for drugs . . . in which the [FEHBA] Carrier receives the value of the PBM's negotiated [rebates]." FEHB Standard Contract at I-18. Thus, PBMs that "negotiate[] and collect[]" rebates must "credit to the Carrier either as a price reduction or by cash refund the value all [rebates] properly allocated to the Carrier." *Id.* This requirement applies to all FEHBA-Carrier PBMs because all FEHBA-Carrier PBMs negotiate and collect rebates. Oesterle Decl. ¶ 8. Subject to these requirements, rebates negotiated by PBMs with manufacturers and credited to the FEHBA Carrier reduce the federal government's FEHBA-related cost of medicine—including diabetes medicine. *Id.* ¶ 5.

OPM also requires that PBMs provide periodic Manufacturer Payment Reports regarding negotiated rebates. FEHB Standard Contract at I-18 to I-19. These reports must include information about the PBM's entire portfolio and client base, not just its FEHBA clients. The PBMs must report: (1) "the dollar amount of Total Product Revenue for the reporting period, with respect to the PBM's entire client base"; (2) "the dollar amount of all Manufacturer Payments earned by the PBM for the reporting period"; (3) "the percentage of all Manufacturer Payments earned by the PBM for the reporting period that were Manufacturer Formulary Payments, which

are payments the PBM receives from a manufacturer in return for formulary placement and/or access, or payments that are characterized as 'formulary' or 'base' rebates or payments pursuant to the PBM's agreements with pharmaceutical manufacturers"; and (4) "the percentage of all Manufacturer Payments received by the PBM during the reporting period that were Manufacturer Additional Payments, which are all Manufacturer Payments other than Manufacturer Formulary Payments." *Id.* at I-18 to I-19.

OPM also retains authority to exercise direct oversight of PBM activities. For instance, OPM insists upon contract provisions entitling it to "review and receive any information and/or documents the [FEHBA] Carrier receives from the PBM, including a copy of its contract with the PBM." *Id.* at I-19. PBMs also must provide the OPM Office of Inspector General upon request "all PBM records including, but not limited to: (i) [a]ll PBM contracts with Participating Pharmacies; (ii) [a]ll PBM contracts with Pharmaceutical Manufacturers; (iii) [a]ll PBM contracts with third parties purchasing or using claims data; (iv) [a]ll PBM transmittals in connection with sales of claims data to third parties; and (v) [a]ll PBM Maximum Allowable Cost (MAC) price lists." *Id.* at I-19.

Caremark contracts with a number of FEHBA plans to administer the pharmacy benefit component of those plans, including the Blue Cross and Blue Shield Association Federal Employee Program ("FEP"), the Government Employees Health Association ("GEHA"), the National Association of Letter Carriers ("NALC"), and the Mail Handlers Benefit Plan ("MHBP"). Oesterle Decl. ¶ 3. Those FEHBA plans provide benefits to beneficiaries in the state of Louisiana, including diabetics that have purchased the pharmaceutical drugs at issue. Oesterle Decl. ¶ 3.

In that context, Caremark has been subject to the OPM requirements set forth above regarding disclosure and pass-through of rebates to those plans. *Id.* ¶¶ 4-7. OPM has exercised

its authority to conduct audits of Caremark's performance of PBM services, including auditing Caremark's rebating practices. *Id.* ¶ 7. As those OPM requirements contemplate, Caremark has entered into contracts with Pharmaceutical Manufacturers pursuant to which those manufacturers are obligated to pay rebates that help offset the cost of pharmaceutical drugs. Ex. B, Declaration of Joseph Anderson ("Anderson Decl.") ¶ 4; Am. Compl. ¶¶ 85-87, 92. Caremark and other PBMs are able to negotiate rebates with manufacturers effectively because they can aggregate clients representing a large number of beneficiaries, giving PBMs some degree of leverage. *See* Am. Compl. ¶¶ 100, 103; *see* Anderson Decl. ¶ 5.

Accordingly—and critically for present purposes—Caremark does not negotiate a separate contract for each of its clients with each manufacturer. Anderson Decl. ¶ 5. To the contrary, for most of the period referenced in the complaint, the same manufacturer-PBM contracts that governed rebates for insulin in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans. *Id.* ¶¶ 5-6.

## PROCEDURAL HISTORY

On March 27, 2023, the State filed the operative complaint (the "Amended Complaint"), alleging that PBMs' rebate negotiations with manufacturers constitute a sprawling "Insulin Pricing Scheme" calculated to inflate insulin prices through "secret payments to each PBM Defendant." Am. Compl. ¶¶ 25, 109. The Amended Complaint alleges that these secret "Manufacturer Payments" include all "payments or financial benefits of any kind conferred by the Manufacturer Defendants to the PBM Defendants," and include "rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, [and] price or margin guarantees." *Id.* ¶ 110. The State also alleges that these "Manufacturer Payments" are not genuine, bargained-for rebates, but instead "are *quid pro quo* for formulary inclusion on the PBMs' standard [formulary] offerings." *Id.* The State further alleges that these rebate payments led to inflated insulin prices,

and that those inflated prices ultimately were paid by Louisianan diabetics as well as the State through its administration of the state Medicaid program and in its proprietary capacity as a purchaser of the at-issue drugs for its state-run facilities. *Id.* at ¶¶ 141-44.

The State claims that Caremark's rebating practices violate the Louisiana Unfair Trade Practices Act, La. R.S. § 51:1401 *et seq.* ("LUTPA"), the Medical Assistance Programs Integrity Act, La. R.S. § 46:437.1 *et seq.* ("MAPIL"), the Louisiana Monopolies Act, La. R.S. § 51:121 *et seq.*, and caused an unjust enrichment. Am. Compl. ¶¶ 179-216. The State seeks, *inter alia*, restitution, damages, and injunctive relief. *Id.* ¶ 15.

Express Scripts timely removed the action to this Court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and Caremark filed a Supplemental Notice of Removal pursuant to the same. ECF Nos. 1, 4.

## LEGAL STANDARD

The federal-officer-removal statute permits any person "acting under" a federal officer who is sued "for or relating to any act under color of such office" to remove a case to federal court. 28 U.S.C. § 1442(a)(1). The Supreme Court has recognized that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Maypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

In assessing the breadth of Section 1442(a)(1), courts consider the statute's "basic' purpose": namely, "to protect the Federal Government from the interference with its 'operations'" that could result from litigation in hostile state courts. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 148, 150 (2007). The statute also seeks to protect against "state court proceedings [that] reflect local prejudice" against federal programs and policies. *Id.* at 150. Thus, "federal officer removal . . . is unlike other removal doctrines: it is not narrow or limited." *St. Charles Surgical*

*Hosp. v. La. Health Serv. & Indem. Co. (St. Charles II)*, 990 F.3d 447, 450 (5th Cir. 2021) (citation omitted). Instead, "the federal officer removal statute is liberally construed in favor of removal." *Neal v. Ameron Int'l Corp.*, 495 F. Supp. 3d 375, 382 (M.D. La. 2020) (citing *Watson*, 551 U.S. at 147-48). The Court therefore must assess jurisdiction "without a thumb on the remand side of the scale." *St. Charles II*, 990 F.3d at 450 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020)).[2]

A notice of removal must give only "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). Accordingly, the removing party is "not require[d] . . . to provide evidence" in support of removal unless the party challenging removal presents evidence of its own. *Webb v. 3M Co.*, 627 F.3d 612, 2022 WL 4225393, at *2 (S.D. Miss. Sept. 13, 2022) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014)); *see Carter v. Westlex Corp.*, 643 F. App'x 371, 375 (5th Cir. 2016). And given the liberal standard that applies to federal-officer removal, the Court must resolve "any factual disputes in favor of federal jurisdiction." *Jackson v. Avondale Industries Inc.*, 469 F. Supp. 3d 689, 701 (E.D. La. 2020) (citing *Lousiana v. Sparks*, 978 F.2d 226 (5th Cir. 1992)).

To remove under Section 1442(a)(1), a party must show that (1) it is a person within the meaning of the statute; (2) it acted under the direction of a federal officer; (3) the charged conduct is connected or associated with an act pursuant to a federal officer's directions; and (4) it has

---

[2] The State (at 22) claims that *Louisiana v. Sparks*, 978 F.2d 226 (5th Cir. 1991) held that the Court's liberal construction of Section 1442(a)(1) is "limited to a narrow set of circumstances." Not so. Section 1442(a)(1) is always interpreted broadly in favor of removal. *E.g.*, *Maypenny*, 451 U.S. at 242. To be sure, *Sparks* itself addressed the "narrow" scenario of whether the defendant could remove a state-court subpoena before formal contempt proceedings were initiated. 978 F.2d at 232. But other than demonstrating that the Fifth Circuit has allowed federal-officer removal in cases brought by the state of Louisiana, *Sparks* is irrelevant.

asserted a colorable federal defense. *Latiolais*, 951 F.3d at 296. Caremark is a person within the meaning of the statute, *see St. Charles I*, 935 F.3d at 355, which the State does not dispute.

## ARGUMENT

I. **Caremark Meets the Requirements of Section 1442(a)(1).**

A. **Caremark Acted Under the Direction of a Federal Agency in Administering the Health Benefits Program for Federal Employees.**

"The words 'acting under' are broad," and "must be liberally construed." *Watson*, 551 U.S. at 147 (cleaned up). To satisfy the "acting under" element, a private entity's actions must "involve an effort to assist, or to help carry out, the duties or tasks of [a] federal superior." *Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) (citation omitted). That is a low bar. To satisfy the "acting under" prong, "a removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive." *St. Charles II*, 990 F.3d at 454. A party "need only show that it 'helped the Government to produce an item that it needs or performed a job that, in the absence of a contract with a private firm, the Government itself would have to perform.'" *Jackson*, 469 F. Supp. 3d at 707 (quoting *Watson*, 551 U.S. at 154) (cleaned up); *see Zeringue v. Crane Co.*, 846 F.3d 785, 792 (5th Cir. 2017), *overruled on other grounds by Latiolais*, 951 F.3d 286. The "archetypal case" therefore occurs when a complaint challenges conduct undertaken "while working under a federal contract." *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021).

Caremark easily satisfies this requirement. As set out above, Caremark helps administer FEHBA pursuant to contracts with FEHBA Carriers. *Supra* pp. 3-6. OPM oversees Caremark's FEHBA-related activities, regulating everything from how Caremark defines, reports, and identifies Manufacturer Payments; to how Caremark should incorporate rebates into reported pricing; to the amount of Manufacturer Payments Caremark must pass on to federal clients. *Supra*

pp. 4-6.  While carrying out its duties under FEHBA contracts, Caremark is "subject to OPM oversight, . . . submits to OPM's regulatory requirements, and ultimately answers to federal officers."  *St. Charles I*, 935 F.3d at 356.

The Fifth Circuit, along with the Eighth, Ninth, and Eleventh Circuits, has held that FEHBA Carriers, and other similar entities, help the government fulfill the basic task of establishing the federal employee health benefits program—and therefore qualify for federal officer removal.  See *id.* at 356; *Jacks*, 701 F.3d at 1234-35; *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1247 (9th Cir. 2017); *Anesthesiology Assocs. of Tallahassee v. Blue Cross Blue Shield of Fl., Inc.*, 2005 WL 6717869 at *2 (11th Cir. Mar. 18, 2005).  By performing PBM services for FEHBA Carriers, Caremark does the same.  *See, e.g.*, *Cnty Bd. of Arlington Cnty v. Express Scripts Pharm., Inc.*, 996 F.3d 243, 253-54 (4th Cir. 2021) (PBM subcontractors are "acting under" federal officers).  Indeed, the Standard OPM contract at issue in *St. Charles II* is nearly identical to the very contract imposing the relevant requirements on Caremark here.  *Compare* FEHB Standard Contract at I-18 to I-19, *with St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, No. 2:19-cv-13497 (E.D. La. Nov. 8, 2019), Dkt. 1-2, Ex. 2 at I-17 to I-18.  Because OPM "made [PBMs] directly accountable to the federal government," Caremark "acts under" the direction of a federal officer.  *See Cnty. Bd. of Arlington*, 996 F.3d at 253.

The State's responses fail.  The State (at 21) argues that the *St. Charles* cases are distinguishable because those claims "arose directly from [defendant's] actions in administering health care benefits" while this lawsuit is "completely unrelated" to any OPM conduct.  But the State's argument improperly conflates the "acting under" prong with the "connection" prong, which must be treated as "distinct" requirements.  *See St. Charles II*, 990 F.3d at 454.  Just like the

10

defendants in *St. Charles*, Caremark performs federal duties on behalf of OPM subject to the FEHB contract and OPM's oversight and control in order to assist OPM carry out its obligations to provide health benefits to federal employees.  *See* Oesterle Decl. ¶¶ 4-7.  That is sufficient.

The State's purported distinction also fails because the Amended Complaint challenges conduct regulated by OPM.  The Amended Complaint alleges a conspiracy to raise insulin prices through "secret" rebate payments that the Manufacturers paid to Caremark.  *See, e.g.*, Am. Compl. ¶¶ 109-10, 114, 124, 131, 139, 154.  Those supposedly "secret" rebate payments include rebates that Caremark obtained on behalf of its federal clients, and that it passed through to FEHBA Carriers, because it was required to do so by OPM.  *See* Oesterle Decl. 3-5.  As in *St. Charles*, therefore, this lawsuit squarely concerns—and attempts to upend—Caremark's administration of health care benefits for federal employees.  Indeed, courts routinely allow removal for conduct far more removed from core FEHBA benefits administration than the State challenges here.  The Eighth Circuit has held that a FEHBA carrier "acted under" a federal officer when pursuing a subrogation claim related to benefits it had administered because "broadly speaking, the subrogation provision [was] necessarily a product of the benefit payment process."  *Jacks*, 701 F.3d at 1233.  Caremark's negotiating with manufacturers and passing rebates through to FEHBA Carriers is not merely a "product" of the process OPM regulates; it is the core of Caremark's federal duties.

The State (at 14, 17-18) argues that Caremark is not entitled to removal because it contracts with FEHBA Carriers rather than OPM and therefore does not have a "direct relationship" with OPM.  "Direct oversight of the specific acts that give rise to a plaintiff's complaint," however, "is not required."  *Zeringue*, 846 F.3d at 792.  "Instead, the 'acting under' inquiry examines the relationship between the removing party and the relevant federal officer, requiring courts to

determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor." *St. Charles II*, 990 F.3d at 455 (quoting *St. Charles I*, 925 F.3d at 356) (alteration in original).  OPM exerts "guidance" and "control" over Caremark by mandating that FEHBA Carriers include specific provisions in their subcontracts with PBMs that indisputably govern Caremark's rebating practices.  *See* FEHB Standard Contract at I-18 to I-19.  OPM also exerts direct audit authority over Caremark's rebating practices.  *See* Oesterle Decl. ¶ 7.  Indeed, the Fourth Circuit has held that a similar PBM subcontractor "act[s] under" federal officers and is entitled to removal.  *See Cnty Bd. of Arlington Cnty*, 996 F.3d at 253-54.

The State (at 19) attempts to distinguish *Arlington County*, arguing that the subcontractor there was subject to direct federal control because the federal officer exercised "audit and inspection rights."  But as set forth in the Oesterle Declaration, the Office of Inspector General has exercised its audit authority on behalf of OPM and audited the rebating practices that Caremark performs for FEHBA clients.  Oesterle Decl. at ¶ 7.[3]  The State (at 18 n.21) also contends, without citation, that the Fifth Circuit has "declined to join" the Fourth Circuit's approach in *Arlington County*.  The State is wrong.  The Fifth Circuit expressly endorsed *Arlington County* both times it considered the case.  *See Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, 2023 WL 2573914, at *3 (5th Cir. Mar. 20, 2023); *Plaquemines Parish v. Chevron USA, Inc.*, 2022 WL 9914869, at *4 (5th Cir. Oct. 17, 2022).  In so doing, the Fifth Circuit explained that the "acting under" prong is met when—as here—a "governmental contract not only contemplate[s] the use of subcontractors; it also ma[kes] them directly accountable to the federal government." *Plaquemines*

---

[3] The State (at 19) further claims that here, unlike in *Arlington*, the claims and remedies sought "have no relationship whatsoever to the Defendants' supposed obligations" to the federal government.  It is not clear if this is an argument about whether Caremark "acts under" a federal officer, but it is meritless in any event.  The State challenges rebating practices that Caremark undertakes to help OPM provide health benefits to federal employees.  *See supra* pp. 3-6, 9-10.

*Parish*, 2022 WL 9914869, at *4 (cleaned up).  Thus, when a federal agency exercises sufficient oversight over the removing defendant, "[t]he fact that [the defendant] was a mere subcontractor and not in direct privity of contract with [the agency] does not undermine" its ability to remove. *Trinity Home Dialysis, Inc.*, 2023 WL 2573914, at *3.

Finally, the State's authorities establishing that a party is not a federal officer simply because it is "subject to federal regulations" and is "compl[ying] . . . with federal laws" are beside the point.  State Br. at 15, 17-18, 20 (citing *Watson*, 551 U.S. at 153; *Box v. Petrotel, Inc.*, 33 F.4th 195 (5th Cir. 2022); *Port of Corpus Christi Auth. v. Port of Corpus Christi L.P.*, 57 F.4th 432 (5th Cir. 2023); *Plaquemines Par.*, 2022 WL 9914869, at *3).  Caremark has never argued that it is entitled to removal because it operates in a highly regulated industry.  Caremark is, instead, entitled to removal because it is a private contractor that "assist[s], or . . . help[s] carry out, the duties or tasks of the federal superior."  *Bell*, 743 F.3d at 89.  Caremark performs this work subject to a federal contract—the "archetypal" acting-under relationship.  *Williams*, 990 F.3d at 859.

### B.    The State's Claims Are Related to Caremark's Federal PBM Services.

Caremark's federal conduct is related to the State's claims.  "Over time . . . , Congress has broadened the removal statute repeatedly until it reached" the current text.  *Latiolais*, 951 F.3d at 290.  Prior to its most recent amendment, the Fifth Circuit interpreted Section 1442(a)(1) to require removing defendants to demonstrate that "a direct causal nexus exists between the defendants' actions taken under color of federal office and [the plaintiff's] claims."  *Id.* at 291 (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)).  In 2011, however, Congress amended Section 1442(a)(1) such that a suit need only be "for or *relating to* any act under color of federal office" to justify removal. Pub. L. No. 112-51, 125 Stat. 545 (codified at 28 U.S.C. § 1442(a)(1)) (emphasis added).  Under the 2011 amendments, removal now is proper so long as

13

"the charged conduct is connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296 (overruling the "causal nexus" test).

In determining the "connection" element, "the State's allegations do not control the . . . analysis." *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017).  Instead, the Court "must credit [the defendant's] theory of the case to determine whether [the defendant] has made an adequate threshold showing that the suit is for an act under color of office." *Id.*; *see Jefferson Cnty v. Acker*, 527 U.S. 423, 432 (1999).  Accordingly, regardless of whether the State contends that its claims are unrelated to Caremark's federal duties, Caremark "should have the opportunity to present [its] version of the facts to a federal court." *Kleinert*, 855 F.3d at 312 (quoting *Osborn v. Haley*, 549 U.S. 225, 251 (2007)).  A dispute of fact, in other words, requires removal.  *Id.*

Caremark's federal duties have a clear "connect[ion]" and "associat[ion]" with the State's claims because the State challenges Caremark's rebating practices performed on behalf of the federal government.  The State does not dispute that many Louisianans that it alleges were harmed by the purported "scheme" were federal employees who received insulin through FEHBA Carriers serviced by Caremark.  *See, e.g.*, State Br. at 6, 24.  Accordingly, the rebates the State alleges were "secret" payments used to artificially increase insulin prices include rebates that Caremark negotiated on behalf of FEHBA Carriers—rebates that ultimately were passed through to the FEHBA Carriers and effectively became federal funds.  *See St. Charles I*, 935 F.3d at 536.

Even without this direct connection to Louisianan federal employees, the State's lawsuit challenging rebate negotiations and Manufacturer Payments has a sufficiently close relationship with Caremark's federal duties.  Caremark's negotiations and contracts with manufacturers for rebates were not unique to FEHBA, and for most of the time period at issue the manufacturer contracts that dictated rebates for FEHBA and non-FEHBA plans were the same.  Anderson Decl.

14

¶¶ 5-6.  Accordingly, a key component of the conduct that the State challenges is indivisible as between Caremark's FEHBA clients and its other clients.  *See id.*  The State did not try to distinguish between FEHBA and non-FEHBA rebate negotiations and, as a matter of fact, there is no way to do so.  Anderson Decl. ¶¶ 4-6.

The State (at 22-24) argues that there is "no overlap" between Caremark's federal conduct and the State's claims because the challenged conduct occurs "prior to" administration of the contracts.  That argument is directly contradicted by the Amended Complaint's allegations that list prices increased because Manufacturers agreed to pay rebates to Caremark in exchange for favorable formulary placement.  *E.g.*, Am. Compl. ¶¶ 85, 92, 110.  The rebate negotiations that the State claims were a conspiratorial ruse were undertaken on behalf of Caremark's clients, including its FEHBA clients, pursuant to the terms of the client contracts.  And the rebates for which Caremark negotiated were paid back to FEHBA plans pursuant to OPM requirements.  Even if manufacturer list prices are an "input" into certain calculations under Caremark's FEHBA contracts, the contracts themselves address the negotiation process at the heart of the State's claims.

The State's reliance (at 25-26) on *Mesa v. California*, 489 U.S. 121 (1989) fails too.  There the parties did not dispute the "connection" element.  The issue instead was whether federal officers must raise a colorable federal defense to qualify for federal officer removal.  The court answered yes.  Caremark has never disputed that it needs to allege a colorable federal defense— and Caremark has done so, as discussed below.  Contrary to the State's assertions, therefore, *Mesa* does not support the State's argument about the "connection" element nor any issue in this case.[4]

---

[4] The State's reliance on the 1926 case of *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) fails because that case (of course) preceded the 2011 amendment expanding the scope of Section 1442(a)(1) to include any conduct "relating to" an act under color of federal office.

### C.    Caremark Has a Colorable Federal Defense.

Section 1442(a)(1) confers federal jurisdiction when a federal question is presented by the federal officer's defense. *Latiolais*, 951 F.3d at 290.   The statute thus "permits a federal defense. . . to serve as the federal question that endues the court with jurisdiction." *Zeringue*, 846 F.3d at 789; *see Mesa*, 489 U.S. at 136-37.  Section 1442(a)(1) therefore is an "exception to the usual 'well-pleaded complaint' rule," which typically requires that a federal question be present from the face of the complaint. *Kleinert*, 855 F.3d at 311 (quoting *Mesa*, 489 U.S. at 129, 136-37).  "Because § 1442 allows the assertion of a colorable federal defense to serve the function typically reserved for the assertion of a colorable federal claim," the Fifth Circuit applies the same standard to a federal officer's defense that it applies for federal-question jurisdiction. *Zeringue*, 846 F.3d at 790.  Under that relaxed standard, the "asserted federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Latiolais*, 951 F.3d at 297.[5]

Caremark has a colorable federal defense that the State's claims are preempted by FEHBA. FEHBA's express preemption provision provides that "[t]he terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans."  5 U.S.C. § 8902(m)(1).  As the State concedes, this preemption provision is "broad."  State Br. at 30.  Thus, the Fifth Circuit has

---

[5] The State claims that a defense is not colorable if it would not "independently support Article III 'arising under' jurisdiction."   State Br. at 27.  To the extent the State contends that Caremark needs to establish that its preemption defense would support an affirmative claim "arising under" federal law, it is incorrect.  The defense need only present a question of federal law. *See Mesa*, 489 U.S. at 127-28 (explaining that self defense is a federal defense if it turns on a question of federal law).

16

recognized that such FEHBA contracts "displac[e] state law on issues relating to 'coverage or benefits' afforded by health-care plans.'" *St. Charles I*, 935 F.3d at 357 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 683 (2006)).

The FEHB Standard Contract has preemptive force because it "relate[s] to the nature, provision, or extent of coverage of benefits." 5 U.S.C. § 8902(m)(1). The State does not dispute that the FEHB Standard Contract contemplates Caremark's negotiation for rebates and governs its conduct while carrying out those duties. Caremark therefore has a colorable defense that the FEHBA contract preempts the State's claims. Indeed, the Fifth Circuit has recognized that a substantially similar version of the FEHB contract is entitled to preemptive effect. *See St. Charles I*, 935 F.3d at 357. Caremark's federal defense therefore is not "wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 297.

The State fails to raise any argument under the applicable standard that Caremark's federal preemption defense is not "colorable." Any challenge to the third prong is thus forfeited. *See Wages and White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1142-43 (5th Cir. 2021). The State instead (at 31-33) contends that removal is inappropriate because there is no federal question presented by the "well-pleaded complaint." That argument is baseless because Section 1442(a)(1) is an exception to the well-pleaded complaint rule. *Kleinert*, 855 F.3d at 311.

The State (at 34-35 & n.37) argues that FEHBA does not provide a basis for "complete preemption." But complete preemption is an entirely separate doctrine, unrelated to Section 1442(a)(1), that provides a further exception to the well-pleaded complaint rule when a federal statute "completely pre-empts [a] state law cause of action" such that "a claim which comes within the scope of that cause of action . . . is in reality based on federal law." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004) (quoting *Ben. Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)).

17

Caremark never has sought removal on the basis of complete preemption, so the State's arguments in this respect are irrelevant.

The State also discusses what it calls "implied complete preemption," and seemingly attempts to litigate the merits of Caremark's preemption defense. State Br. at 35-39. That is improper. Section 1442(a)(1) "does not require a federal official or person acting under him "to 'win his case before he can have it removed.'" *Latiolais*, 951 F.3d at 296-97 (quoting *Acker*, 527 U.S. at 431). Indeed, the State's argument only highlights that Caremark's defense is colorable. The State relies almost exclusively on the Supreme Court's decision in *Rutledge v. Pharmaceutical Care Management Association*, 141 S. Ct. 474 (2020), which did not involve federal-officer removal and did not even discuss FEHBA. Instead, that case addressed ERISA preemption, a different statute with a different preemption provision. *See id.* at 479. The preemption clause at issue there was narrower than the one at issue here because ERISA preempts state laws only if they "relate to any employee benefit plan *covered by ERISA*." *Id.* (quoting 29 U.S.C. § 1144(a)) (emphasis added). In contrast, FEHBA preempts any state law "which relates to health insurance or plans," full stop. 5 U.S.C. § 8902(m)(1). If the State wishes to argue that the Court should extend *Rutledge*, it can do so at the appropriate time and place—when the merits of the defense is presented, and in federal court. The only question for removal purposes is whether the defense is "wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 297. It is not.

## II.     The State Is Not Exempt from Section 1442(a)(1).

The State also contends that its status as a sovereign somehow creates an exception to Section 1442(a)(1). Both of the State's argument on this front fail.

### A.     The State's *Parens Patriae* Status Does Not Justify Remand.

The State contends that removal is inappropriate because it brings this case in its *parens patriae* capacity. That argument fails.

*First*, the State (at 5-6) argues that it has authority under Louisiana law to bring a claim in its *parens patriae* capacity.  But Caremark's removal notice did not challenge Louisiana's *parens patriae* authority, and nothing in the State's remand motion turns on that question.

*Second*, the State (at 6-7) argues that removal is inappropriate because, in bringing this claim *parens patriae*, it is not standing in the shoes of Louisianan diabetics or seeking damages for individuals' insulin expenditures.  But the State concedes that its "*parens patriae* duty extends to the collective populace of Louisiana, including any citizens who . . . might conceivably receive . . . health coverage through [FEBBA]."  State Br. at 6.  Regardless of the *remedy* the State seeks, therefore, the Amended Complaint unambiguously challenges Caremark's federal *conduct*.

Even if the State does not seek "damages" as a representative for individual Louisianans, the State does seek monetary relief "on behalf of its citizens," including "restitution" and "disgorgement."  Am. Compl. ¶ 180.  The monetary award the State seeks therefore necessarily includes payments made by FEHBA beneficiaries pursuant to the FEHBA contracts that govern Caremark's federal duties, and it is irrelevant whether the relief is called "damages" or "restitution."  And setting aside the monetary relief the State seeks, the Amended Complaint also seeks to enjoin the challenged conduct—which concededly includes Caremark's conduct in negotiating and obtaining rebates that are passed through to FEHBA plans, lowering costs for those plans and ultimately the Louisiana FEHBA beneficiaries they serve.  *See id.*

*Third*, the State (at 9) says that its sovereign status for part of its claims entitles it to a State forum.  That contention turns the federal officer removal statute on its head.  Section 1442(a)(1)'s central purpose is to allow federal officers to litigate federal defenses in federal court, preventing states from bringing lawsuits reflecting "local prejudice[s]" in "hostile state court[s]."  *See Watson*, 551 U.S. at 148, 150.  Excluding from Section 1442(a)(1)'s reach claims brought by states would

create a sweeping exception to federal officer removal and open the door to the very harms Congress sought to prevent. Indeed, whatever sovereign interest the State claims to have in this case surely is equally (if not more) applicable to criminal prosecutions brought under state law. But state prosecutions of federal officers performing federal functions is the very heartland of Section 1442(a)(1)'s protection. *See Watson*, 551 U.S. at 148. It is telling (and unsurprising) that the State fails to identify a ***single case*** in which a court anywhere has imposed a heightened burden on a federal officer when seeking removal under Section 1442(a)(1) from a claim brought by a state. On the contrary, courts routinely apply the ordinary (flexible) officer-removal standard for claims brought by states against federal officers. *See, e.g.*, *Kleinert*, 855 F.3d at 312.

## B.   The State Is Not Entitled to Sovereign Immunity.

The State (at 10-11) invokes sovereign immunity as a separate basis for remand. That argument fails. The State cannot simultaneously initiate suit against a federal officer and thereafter assert immunity to avoid a federal forum. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted *against one of the United States* by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI (emphasis added). The text of the Eleventh Amendment therefore is clear that it applies to claims brought "against" states, not claims brought by states.

To be sure, the scope of sovereign immunity is not strictly limited to the text of the Eleventh Amendment. *Alden v. Maine*, 527 U.S. 706, 728-29 (1999). But the Supreme Court repeatedly has acknowledged that when plaintiff states sue parties otherwise entitled to a federal forum, "those suits may . . . be brought in or removed to the [federal] courts." *Illinois v. Milwaukee*, 406 U.S. 91, 101 (1972); *see Ames v. Kansas*, 111 U.S. 449, 462 (1884) ("[A] suit brought by a State in one of its own courts … can be removed to [federal] court[]."). Thus, as the State (at 11 n.13) concedes,

the Fifth Circuit has observed that "[o]f course, the eleventh amendment is inapplicable when a state is a plaintiff." *Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., Inc.*, 625 F.2d 22 (5th Cir. 1980); *see also, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 119-20 (2d Cir. 2007); *California ex rel. Lockyear v. Dynegy, Inc.*, 375 F.3d 831, 847 (9th Cir. 2004); *Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*, 359 F.3d 1237, 1239-40 (10th Cir. 2004); *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1564 (Fed. Cir. 1997). The leading civil procedure treatise agrees that sovereign immunity "can[not] be successfully invoked to bar removal if the State was a plaintiff in the state-court action." 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3721 (4th ed. 2023).

The State's attempt to dodge this precedent fails. *First*, the State (at 11 n.13) claims that the Third Circuit in *In re Flonase Antitrust Litigation*, 879 F.3d 61 (3d Cir. 2017) allowed a state plaintiff to invoke sovereign immunity. Not so. The state there was an absent class member, not a plaintiff, and the court allowed the State to assert sovereign immunity because the private parties "sought an injunction against [the] state" as part of a settlement agreement. *Id.* at 66. Here, Caremark is defending a suit brought by the State, not seeking an injunction against it.

*Second*, the State (at 11 n.13) says that the Fifth Circuit has subsequently left open the question of whether state-initiated proceedings are categorically exempt from sovereign immunity. State Br. at 11 n.13 (citing *In re Katrina Canal Litig. Breaches*, 524 F.3d 700, 711 (5th Cir. 2008)). In *Katrina Canal*, the Fifth Circuit held that Louisiana could not invoke sovereign immunity to avoid removal under the Class Action Fairness Act. 524 F.3d at 711. The court canvassed the overwhelming authority that plaintiff states cannot invoke sovereign immunity, but observed that the earlier precedent did not answer the question of whether immunity could apply when removal

was sought "on diversity grounds under CAFA, rather than federal question jurisdiction." *Id.* The court therefore denied sovereign immunity on narrower grounds. *See id.*

The court's observation is inapplicable because Caremark did not remove under diversity jurisdiction—it did so under the federal-officer removal statute. And the Supreme Court has expressly rejected a state's assertion that federal officer removal would offend the state's sovereign status. *See Tennessee v. Davis*, 100 U.S. 257, 266-67 (1879). The Court explained that "when the national government was formed, some of the attributes of State sovereignty were partially, and others wholly, surrendered and vested in the United States." *Id.* at 266. Thus, "the execution and enforcement of the laws of the United States, and the judicial determination of questions arising under them, are confided to another sovereign," and the "removal of cases arising under [federal] laws . . . is, therefore, no invasion of State domain." *Id.* at 267; *see In re MTBE*, 488 F.3d at 116-17. Indeed, Congress enacted the federal-officer removal statute to guarantee federal officers a federal forum even for cases initiated by states in state court and under state law. *See Watson*, 551 U.S. at 148, 150. The State's sweeping assertion that sovereign immunity can bar removal would render Section 1442(a)(1)—and centuries of federal-officer-removal precedent—a dead letter.

*Third and finally*, the State (at 11 n.13) points to a single case, *Moore ex rel. Mississippi v. Abbott Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995), in which a court allowed a state plaintiff to avoid removal by asserting sovereign immunity. That case, however, has been rejected by every court that has cited it, *see, e.g.*, *In re MTBE*, 488 F.3d at 120; *In re Oil Spill by Oil Rig Deepwater Horizon*, 747 F. Supp. 2d 704, 710 (E.D. La. 2010), *aff'd sub nom. In re Deepwater Horizon*, 745 F.3d 157 (5th Cir. 2014); *Virginia ex rel. Kilgore v. Bulgartabac Holding Grp.*, 360 F. Supp. 2d 791, 794-95 (E.D. Va. Mar. 3, 2005) (collecting cases rejecting *Abbott Laboratories*), and the only case it cited to support its holding has been overruled, *see Dynegy*, 375 F.3d at 849

n.15 (overruling *California v. Steelcase, Inc.*, 792 F. Supp. 84, 86 (C.D. Cal. 1992)).  This Court

should do the same.

## **CONCLUSION**

For the foregoing reasons, the State's motion to remand should be denied.

DATE: June 23, 2023

Of Counsel:

Enu Mainigi (*pro hac vice*)
Craig Singer (*pro hac vice*)
R. Kennon Poteat III (*pro hac vice*)
A. Joshua Podoll (*pro hac vice*)
**WILLIAMS AND CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com

*Attorneys for CaremarkPCS Health, L.L.C.*
*and CVS Health Corporation*

Respectfully submitted,

*/s/ James A. Brown*
James A. Brown (Bar # 14101)
Melanie Derefinko (Bar # 37658)
Courtney Harper Turkington (Bar # 38255)
LISKOW & LEWIS
801 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
jabrown@liskow.com
mderefinko@liskow.com
chturkington@liskow.com

*Attorneys for CaremarkPCS Health, L.L.C.*
*and CVS Health Corporation.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 23, 2023 the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/James A. Brown*
*Attorney for CaremarkPCS Health, L.L.C. and CVS Health Corporation.*