UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA | CIVIL ACTION |
| VERSUS | |
| SANOFI-AVENTIS U.S. LLC, ET AL. | NO. 23-302-BAJ-SDJ |

**PLAINTIFF STATE OF LOUISIANA'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO REMAND**

Defendants' opposition cannot surmount the uncontroverted facts that require this federal-officer-removal inquiry to be resolved in the State's favor. Indeed, just weeks ago a federal district court in California remanded a virtually identical State action against the very same PBM Defendants back to state court.[1] This Court should do the same.

**Defendants Carry the Burden of Proof**

While Defendants dispute their burden of "proving" with evidence, as opposed to merely "alleging," that removal is proper, their protest carries no weight. *See* ECF Doc. 35 at 9-10; Doc. 36 at 12. As the federal district court in California just observed in its remand order, "Defendants seeking removal 'still bear the burden of proving by a preponderance of the evidence that the colorable federal defense and causal nexus requirements for removal are factually supported.'"[2] Whether a burden of "demonstration" is a burden of "production" or a burden of "proof," it is certainly more than a burden of unsubstantiated allegation (which is no "burden" at all). *See* ECF Doc. 24-2 at 18-19. Regardless of nomenclature—"producing," "showing," "demonstrating," or "proving"—Defendants have failed to meet their burden for any of the prongs of the federal-officer removal statute.

---

[1] *See* Order Granting Plaintiff's Motion to Remand, ECF No. 109, dated June 28, 2023, in *The People of the State of California v. Eli Lilly and Company, et al.*, No. 23-cv-01929-SPG-SK, Central District of California (attached hereto as "**Exhibit A**").
[2] *See* **Exhibit A** at 3-4 (citing *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022)).

**No Federal "Officer"**

First, no federal "officer" has ever provided the PBM Defendants with any "direction" in the context of their health-benefit-plan-administration subcontracting work, and neither of the Defendants has identified such an officer. To date, neither Defendant has come up with the name of a *single federal employee* who has ever actually given them a direct instruction of any kind. Express Scripts' reliance upon printed words in a standard contract—a contract to which it is not even a party—to conjure the legal fiction of a federal employee giving ongoing "direction" and "supervision" is inadequate to meet its burden of demonstrating this prong of the removal statute. See ECF Doc. 24-2 at 13-18.  To the same end, Caremark relies upon a statute that merely "authorizes" a federal agency (OPM) to contract with private carriers for health insurance, and a boilerplate contract that "permits" and "contemplates" that such carriers might subcontract with PBMs (in which case, if that contingency is met, some transparency standards would be imposed upon the private carriers). Id.  Such flimsy facts do not a federal "officer" make.  Words in a generic contract are not "officers." Indeed, as the State demonstrated in its opening brief, such statutory/ contractual stipulations are far more analogous to detailed "regulations"—which, as controlling legal authority has repeatedly held, do not supply the requisite "federal officer" direction to sustain removal under 28 U.S.C. §1442(a)(1).[3]

Caremark's latest hint at the existence of an officer similarly lacks the specificity of a demonstrable allegation and thus fails to satisfy its burden of proof for removal.[4]  At best, the vague, self-serving statement from Caremark's in-house lawyer suggests that OIG (the Office of the Inspector General), in an isolated incident, may have exercised its contractual discretion to

---

[3] *See, e.g., Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007).
[4] *See* ECF Doc. 36-1, *Affidavit of Matthew C. Oesterle*, Caremark's Senior Legal Counsel (attached as Exh. A. to Caremark's response brief) (vaguely asserting, at paragraph 7, that Caremark "is subject to audits by the U.S. Office of Personnel Management Office of the Inspector General Office of Audits ("OIG")" and that "OIG has exercised its authority to audit" Caremark).

2

request some paperwork from Caremark, not that an identifiable auditor exercised any ongoing direction or supervision over Caremark's work. In any event, the affidavit fails to rectify Caremark's apparent inability to name a federal supervisor with whom any of its employees ever interacted, and thus fails to satisfy Defendant's burden for this prong of the removal statute.

**No Federal "Direction" or "Supervision"**

Second, contractual "permission" and "authorization" does not constitute ongoing "direction" or "supervision." Neither federal contract at issue here (TRICARE nor OPM/ FEHBA) specifically "directs" or "requires" the PBM Defendants to do anything at all[5]—much less any act that is causally or otherwise related to the Insulin Pricing Scheme. The TRICARE contract (to which Express Scripts is not even a party), for example, requires no act or performance to be completed specifically by *Express Scripts*. *See* ECF Doc. 24-2 at 13, 16. Nor does the TRICARE contract *require any specific, affirmative acts* to be taken even *by potential subcontractors* more generally. *See* ECF Doc. 24-2 at 13, n.17. The same is true with regard to the OPM/ FEHBA contract and Caremark. *See generally* ECF Doc. 24-2 at 13-22. As such, these standard contracts are not materially different than the detailed codified regulations that were found in *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007), to constitute inadequate "federal direction" for purposes of removal. *See also* ECF Doc. 24-2 at 20.

**No "Federal" or "Governmental" Acts**

Third, in fulfilling their work obligations as subcontractors, Defendants have never undertaken any "federal" or "governmental" acts. The services that PBM Defendants provided and acts that they took in furtherance of their health-plan-administration subcontracting work

---

[5] Neither federal contract (neither DoD/TRICARE nor OPM/FEHBA) appears to "mandate rebates"; the contracts merely seem to require that rebates and other manufacturer payments, *if paid*, be *reported and disclosed*. The federal agencies thus do not appear to have an inherent interest in maintaining the rebate system, but rather a fundamental interest in ensuring *transparency*. Like most payors, the federal government has apparently been operating within a healthcare payment system that is no longer of its making and has taken on a life of its own.

3

were neither specially tailored to specific governmental needs nor inherently "federal" or "governmental" in nature. During all times pertinent to this action, Defendants acted as private companies doing no more and no less than what they ordinarily do within the scope of their business for non-governmental entities. Indeed, Defendants expressly admit that none of the services that they provide to private insurance carriers contracting with the federal government differ in any material way from the services that they provide to private insurance carriers contracting with commercial clients.[6] Indeed, any interest of the federal government in maintaining the health and economic wellbeing of its employees (the ultimate goal of providing health benefits and keeping health costs down) is *indistinguishable* from the interest of *any commercial employer*. In other words, there is nothing "federal" or "governmental" about any of the PBM Defendants' "acts."[7]

**No Causal Nexus or Connection Between Defendants' Acts and Challenged Conduct**

Fourth, even assuming for the sake of argument that PBM defendants had demonstrated that they were specifically directed by a federal officer or expressly required by a federal contract to negotiate rebates, charge copays and/or to take any other action for the benefit of the federal government or its employees any such "acts" would be insufficiently connected to the challenged conduct in this lawsuit.

As the Fifth Circuit observed regarding the requirement of a causal nexus between "acts taken under color of federal office" and the "conduct being challenged" by the State, the 2011 amendment to 28 U.S.C. § 1442(a)(1) "moving from the causal connection test under 'for' to a

---

[6] *See, e.g.*, ECF Doc. 36 at 10, 18-19, and 21 (Caremark's Mem.); Doc. 36-2 at ¶¶ 5-6 (*Joseph Anderson Affid.*, Exh. A to Caremark's Mem.) (admitting that "Caremark's negotiations and contracts with manufacturers for rebates were not unique to FEHBA," and that "for most of the time period at issue the manufacturer contracts that dictated rebates for FEHBA and non-FEHBA plans were the same") (emphasis added). Caremark alternatively indicates that rebates/ negotiations were not actually "**mandated**," but merely *governed* by the contract *if* "**undertaken**." *Id.*

[7] As the federal district court in California expressly held, "Caremark's indivisibility argument stretches federal officer jurisdiction too far." *See* **Exhibit A** (CA Remand Order) at 12.

connection test under 'for or relating to' was not a radical change." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 295 (5th Cir. 2020). Notably, that amendment retained the word "for." Indeed, *Latiolais* was decided nearly a decade after the federal-officer removal statute was amended and reaffirmed the "causal nexus" requirement.[8] Interestingly, and in apparent agreement with the Fifth Circuit's position on this point of law, the Central District of Californiaconsistently relies upon a "causal nexus" standard throughout its opinion.[9] *See* **Exhibit A** at 3, *et seq.* (relying upon the test set forth in *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022) ("*Mateo III*")).

As a result, the PBM Defendants strain to *redefine*, to their own strategic advantage, the "conduct" challenged by the State in its lawsuit, to make that conduct seem more strongly connected with their ostensibly "federally directed acts." The Court should resist the Defendants' relentless efforts to redefine and mischaracterize the State's lawsuit. Like other payors, the State operates within a health-care system that it did not create. While the State describes in its petition how Defendants have come to *manipulate and abuse* the rebate and manufacturer payment system in furtherance of their collusive pricing scheme, the State does not, as Defendants persistently misstate, challenge "rebate negotiations and Manufacture Payments" in and of themselves.[10] *See* ECF Doc. 1-2 at ¶¶ 19, 22-23, 92-93, 109-10, 130-38; *cf.* ECF Doc. 36 at ¶¶ 1, 18. Nor does the State, in bringing its claims, stand in the shoes of

---

[8] *See id.* at 291 (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 396-400 (5th Cir. 1998)).

[9] *See also*, *infra*, for a relevant observation about the logical and practical necessities of circumscribing the meaning of analogous "relate to" language (in the context of a statutory preemptive-scope inquiry) penned by Justice Scalia. *See Cal. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335-36 (1997). Notably, the ERISA (Employee Retirement Income Security Act) statute at issue in *Dillingham* contains **solely "relate to" language, not the accompanying causal "for" language** that the federal-officer removal statute has *explicitly retained. Id.*

[10] While Caremark asserts, for example, that "[t]his lawsuit challenges [defendants'] rebate-negotiation practices," the State's petition instead clarifies that rebate practices are challenged only insofar as those practices *fail to lower consumer costs*, specifically *within the context of collusion and price gouging*. *Cf.* ECF Doc. 36 at 1. In other words, the State challenges *Defendants' Insulin Pricing Scheme and their conduct in furtherance of that scheme*, not run-of-the-mill rebate practices.

5

individual federal employees or individual federal-health-plan beneficiaries residing within its borders. *See* ECF Doc. 24-2. It neither bases its claims on rebates or co-pays, nor does it seek relief for rebates or co-pays. As is clear from the State's petition, the State bases its claims and requests for relief upon the Insulin Pricing Scheme, upon the false list prices generated by that scheme, and upon the economic and public health damages to the State and its citizens resulting from that scheme.[11] Like the State of California in its recently remanded, lawsuit against the very same Defendants, the State of Louisiana "does not challenge the creation of custom formularies for a federal officer," "does not seek to recover moneys paid by the federal government pursuant to such plans," "does not seek the recovery of federally mandated co-pays that were paid by such plans' patients," and "[a]s such ...does not seek relief from any PBM Defendants that is governed by or available pursuant to any claim(s) involving a federal officer associated with any [FEHBA] or TRICARE governed health benefits plan." *See* **Exhibit A** at 6.

By contrast, the paragraphs in the State's petition that refer to rebates are descriptive in nature and merely provide background information; they do not state claims.[12] The sham rebate system described in the petition illustrates how Defendants were able to get away with the illegal Insulin Pricing Scheme upon which the State bases its claims. As set forth more fully in the petition, this system was used to give the appearance that payors and employees—whether of a governmental agency or of a private commercial entity—were getting a "discount" or a "deal." In reality, the base price of insulin had already been inflated so exorbitantly that these "partial offset" rebates did absolutely nothing to reverse or even materially reduce the overall

---

[11] *See* ECF Doc. 1-2 at ¶¶ 101, 105-06, 114, 116-18, 120-21, 124-25, 130, 138-39, 145, 147, 149, 153-55, 163-66, 172, 174, 176, 178, 197, and 203.

[12] *See, e.g.*, ECF Doc. 1-2 (Am. Pet.) at ¶¶ 19, 22-23, 92-93, 109-10, and 130-38 (stating, in part, that PBM Defendants Caremark, Express Scripts, and Optum "enter[] into rebate contracts with the Manufacturer Defendants" and that "PBMs receive rebates, fees, and other consideration from the Manufacturers ('Manufacturer Payments')," and describing how "[t]hese relationships allow PBMs to exert tremendous influence over what drugs are available throughout Louisiana, on what terms, and at what prices").

inflationary trend of insulin pricing, but only gave the superficial (fraudulent) appearance of doing so. The State's petition describes a system in which payments *falsely labeled* as "rebates" have become (in the words of the Manufacturer Defendants' own corporate representatives) part of a "perverse" and "misaligned" incentive system in which higher reported insulin prices generate higher "rebates" (i.e., kickbacks) for PBMs that ultimately "fail to lower prices to the patient." *See* ECF Doc. 1-2 at ¶ 130, 133 (citing economics study that directly correlated higher rebates to higher prescription costs). Indeed, the conspicuously equivocal "hedging" language used by Mr. Oesterle in his affidavit—namely, that Caremark's FEHBA clients "expect and desire" that rebates be obtained by Caremark to "offset the costs," and that *"*[i]t is [his] understanding that" rebates "ultimately reduces [sic] the cost of … healthcare incurred by the government and/or employees"—walks a careful legalistic line to avoid asserting that the sham rebates *actually function the way they are expected to* (i.e., by actually reducing costs rather than merely slightly "offsetting" them, or even *increasing*[13] them).[14]  *See* ECF Doc. 36-1 at ¶8.

Clearly, the illicit Insulin Pricing Scheme (the "challenged conduct") is not directly connected with or related to, nor is it caused by, legitimate rebates, mandatory copays, or any activity inherent to ordinary, above-board health-plan administration (i.e., the "acts" expected or contemplated by the federal government via the TRICARE and OPM/ FEHBA contracts *to* serve rather than undermine its goal of providing cost-effective health benefits to employees). For this

---

[13] See ECF Doc. 1-2 at ¶ 133 (citing University of South Carolina health-care economics study that directly correlated an increase in rebates and other manufacturer payments to an *increase* in prices).

[14] Obviously, *actual* prescription-cost rebates that function as intended, i.e., as discounts ultimately inuring to the net benefit of patients by way of *reduced prescription and health care costs*, would not trigger legal action by States' Attorneys General. Thus, the State identifies falsely labeled "rebates" in its petition only insofar as those so-called "rebates" are *tied to false list prices that ultimately lead to net increases* in prescription costs for diabetics rather than to net decreases. *See also* ECF Doc. 1-2 at ¶ 110 (observing that "[t]hough Manufacturer Payments are provided **under a variety of labels**, they all share a common trait: all are *quid pro quo* for formulary inclusion on the PBM Defendants' standard offerings"). Indeed, Express Scripts' own President, Amy Bricker, confirmed that Defendant's participation in this *quid pro quo* system. *Id.* at ¶ 131. **Instead of going back into the pockets of patients, these sham rebates line the pockets of Manufacturers and PBMs.**

7

very reason, the State has made clear both in its petition and its remand briefing that it is challenging neither the existence nor the regulatory mechanics of the rebate and/or payment system, but, instead, Defendants' manipulation thereof. A substantially similar disclaimer by the State of California in its insulin-pricing lawsuit against the very same Defendants was sufficient for the federal district court to find it "difficult to see how the requisite causal nexus would continue to exist…" *See* **Exhibit A** at 13, *ll.* 2-5. In other words, there was "no government-directed conduct left ... to which ... liability [for government-directed conduct] would attach"). *See* **Exhibit A** at 13. In the absence of a causal nexus between any "federally directed acts" and the conduct challenged by the State's suit, the court remanded the action back to state court. *Id.*

The same reasoning applies here. Indeed, Caremark readily admits that there is **no "direct connection"** between the State's challenged conduct and "Louisianan federal employees." *See* ECF Doc. 36 at 18. Moreover, as the State has repeatedly explained, it is stepping into the shoes of *no individual citizens* in bringing this action in its sovereign capacities: not those of Louisiana residents who are federal employees, nor those of TRICARE/ FEHBA plan beneficiaries, nor those of any other individual Louisiana citizens. *See* ECF Doc. 24-2.

**<u>No Conflict Between State & Federal Interests or Between State Law & Federal-Contract Compliance</u>**

The federal government's and state government's interests are not opposed in this case.[15] Any interest of the federal government in providing employee health-care benefits while minimizing those employees' health-care costs is fully aligned with the State's interest in the health and welfare of its citizens. Thus, any sub-contractual acts undertaken in good faith to fulfill the federal government's goals of serving and safeguarding both the financial and health

---

[15] This state/federal alignment of interests also underscores that this case bears ***no relationship*** to the federal-removal statute's ***original purpose*** in which disgruntled states were trying to circumvent the federal government's shipping embargoes and the state and federal government's interests were ***completely opposed***.

interests of its employees in its health-plan-related contracts (i.e., any arguably "federally directed" acts), could not logically be related to conduct that the State challenges. Indeed, had Defendants actually been serving the federal government's obvious interests in this regard, the State would unlikely be challenging Defendants' conduct at all.[16] This alignment of interests thus functions the same way as an express disclaimer of claims: "any causal nexus that might otherwise have existed between Plaintiff's claims and the Removing Defendants' conduct **on behalf of** government officers" is negated. See **Exhibit A** at 13-14 [emphasis added].

**No Colorable Federal Defense**

PBM Defendants have failed to demonstrate the existence of a colorable federal defense. They have produced no facts to justify their assertion of government contractor immunity; nor have they demonstrated that the State's state law claims are preempted by the narrow TRICARE and FEHBA statutes.[17] See ECF Doc. 24-2 at 26-39. As the Supreme Court has held, "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." *Mesa v. California*, 489 U.S. 121, 136-37 (1989). Nevertheless, defendants impermissibly resort to the same statute for both their assertions of "federal officer" status (via federal contract) and "federal preemption" of state law

---

[16] Put another way, the State's present action, even if successful, would not interfere with the DoD or OPM's health-plan-service contracts. Indeed, Caremark readily admits that there is no "direct connection" between the State's challenged conduct and "Louisianan federal employees." See ECF Doc. 36 at 18.
In addition, the State's requested injunctive relief would neither eliminate nor prohibit any rebates that the federal government had contemplated, nor any system of copays or payments that the government had prescribed.
[17] In a somewhat mystifying contention, Express Scripts alleges in its response that the State has somehow "conceded" that Express Scripts' federal defenses are "colorable," and has "ced[ed] the point" that the Express Scripts' challenges to the State's requests for injunctive relief are valid. See ECF Doc. 35 at 24. Nothing could be further from the truth. Express Scripts hereby fails to acknowledge that the State specifically addresses Defendants' "colorable federal defense" arguments, including preemption arguments, at pages 26-39 of its remand memorandum. See ECF 24-2 at 26-39. Defendants must prove that the State's causes of action are preempted by the TRICARE and FEHBA statutes in order to prevail upon their preemption arguments. But as the State has demonstrated, *none of its causes of action are preempted by those statutes*.

(via the same federal statute that authorizes/ defines the terms of the federal contract), a tactic heavily criticized by scholars.[18]

The discrete purpose and scope of FEHBA and TRICARE pertain to the administration of health-care benefits for federal employees, a statutory purpose that is in no meaningful way "related to" the purpose and scope of the State of Louisiana's consumer protection and monopoly statutes. The late Justice Scalia remarked upon the logical *necessity* of interpreting this broad and potentially boundless phrase to require enough connectedness and significance for the phrase to retain its purpose and meaning: Otherwise, "applying the 'relate to' provision according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."[19] By the same reasoning, the federal government's health-care-benefit regulations are incapable of preempting the State's state law claims.

## Conclusion

Given the extensive overlap between both the parties and issues arising in the California and Louisiana cases, the district court's opinion in the California case fully supports the State's position that it should be permitted to return to its own courts. Here, Defendants have been unable to demonstrate that the requirements for federal-officer removal jurisdiction have been met. Accordingly, the State respectfully requests the Court expeditiously to remand this action back to the state court in which it originated.

**Respectfully submitted,**

**JEFF LANDRY, ATTORNEY GENERAL FOR THE STATE OF LOUISIANA**
Nicholas J. Diez, No. 31701

---

[18] *See* David S. Rubenstein, *Supremacy, Inc.*, 67 UCLA L. REV. 1130, 1167, 1188-90, 1199-202 (2020) (describing how allowing "preemption by contract" and privatized immunity defenses to supply "the displacing conflict" in the absence of a federal statute that actually conflicts with and preempts state law undermines federalism and constitutional principles) (cited in ECF Doc. 24-2 at 8, n.11).

[19] *See Cal. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335-36 (1997) (Scalia, J., concurring) (cited in ECF Doc. 24-2 at 39, n. 33).

10

Matthew P. Stafford, Jr., No. 32706
Medicaid Fraud Control Unit
Mike Dupree, No. 26870
Public Protection Division
Office of the Attorney General, State of Louisiana
1885 North 3rd Street
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6468
Facsimile: (225) 326-6499
diezn@ag.louisiana.gov
staffordm@ag.louisiana.gov
dupreem@ag.louisiana.gov

  */s/ John Alden Meade*
John Alden Meade, No. 29975
Meade Young, LLC
400 Poydras Street, Suite 1680
New Orleans, Louisiana 70130
T: 504-382-6283
F: 504-717-2846
E: jam@meadeyoung.com

Robert L. Salim, No. 11663
Lisa Causey-Streete, No. 33767
Salim-Beasley LLC
1901 Texas Street
Natchitoches, LA  71457
T: 318-352-5999
F: 318-352-5998
E: skeeter@salim-beasley.com
E: lcausey@salim-beasley.com

Jerald P. Block, No. 3151
Block Law Firm, APLC
422 East 1st Street
Post Office Box 108
Thibodaux, LA  70301
T: 985-446-0418
F: 985-446-0422
E: jpb@blocklawfirm.com

Eulis Simien, Jr., No. 12077
Jimmy Simien, No. 1598
Roy Bergeron, Jr., No. 33726
Simien & Simien, L.L.C.
7908 Wrenwood Boulevard

Baton Rouge, Louisiana 70809
T: 225-932-9221
F: 225-932-9286
E: eulissimien@simien.com
E: jimmysimien@simien.com
E: roybergeron@simien.com

*Attorneys for Plaintiff State of Louisiana*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July, 2023, the foregoing pleading was electronically filed with the Clerk of Court using the Case Management/Electronic Case Files (CM/ECF) system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

    */s/ John Alden Meade*
    John Alden Meade